COMMONWEALTH OF PENNSYLVA-
NIA and New York State Department
of Transportation, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

R. D. TIMPANY, Trustee in Reorganiza-
tion of the Central Railroad Company
of New Jersey, Petitioner,

v.

RAIL SERVICES PLANNING OFFICE
et al., Respondents,

State of New Jersey Department of
Transportation et al., Intervenors.

Nos. 75–1529, 75–1762.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 4, 1976.

Decided March 31, 1976.

Gordon P. MacDougall, Sp. Asst. Atty. Gen., Commonwealth of Pa., Washington, D. C., for petitioner, Commonwealth of Pa. in No. 75–1529 and intervenor Commonwealth of Pa. in No. 75–1762.

John C. McTiernan, Albany, N. Y., for petitioner, New York State Dept. of Transportation in No. 75–1529 and intervenor Commissioner of Transportation of the State of New York in No. 75–1762.

Stanley Weiss, Washington, D. C., for petitioner in No. 75–1762.

Henri F. Rush, Atty., I. C. C., with whom Fritz R. Kahn, Gen. Counsel, I. C. C., John H. D. Wigger and John H. Broadley, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents. Peter A. Fitzpatrick, Atty., I. C. C., Washington, D. C., also entered an appearance for respondent, I. C. C.

Kenneth S. Levy, Trenton, N. J., for intervenor State of New Jersey Dept. of Transportation in No. 75–1762.

Before LEVENTHAL, ROBINSON and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

This case presents petitions to review an order of the Rail Services Planning Office (RSPO) of the Interstate Commerce Commission (ICC) which promulgated legislative regulations [1] pursuant to § 205(d) of the Regional Rail Reorganization Act of 1973, as amended, 45 U.S.C. § 715(d) (Act). The order set forth standards for determining rail service continuation subsidies, to govern rail properties not transferred to the

---

1. 49 C.F.R. § 1125, published in 40 F.R. 1624–36 (Jan. 8, 1975), as amended, 40 F.R. 14186–90 (March 28, 1975).

Consolidated Rail Corporation (Conrail) under the Final System Plan developed pursuant to the Act.

This case was argued on March 4, 1976. It was put on an expedited briefing and argument schedule, in view of the imminence and significance of the April 1, 1976, date set by the Act, as amended in 1976, for transfer of rail properties, and the clear intent of Congress to facilitate continued rail operation and service to the public with respect to both the properties designated for transfer to Conrail and those subject to the rail service continuation subsidy processes of the Act.[2] These same concerns prompt us to render this decision in an expedited fashion, stating only the highlights of our reasoning.

■ 1. The court is of the view that it does not have jurisdiction to decide the claim of R. D. Timpany, trustee in reorganization of the Central Railroad Company of New Jersey, that the Act authorizes RSPO "to establish standards for determining a reasonable rate of return on value" in violation of its constitutional right to "a judicial determination of just compensation for its property taken by eminent domain."[3] No jurisdictional issue has been raised, and apparently this court did have jurisdiction of the case, under 28 U.S.C. §§ 2321, 2342, as amended Pub.L. 93–584, 88 Stat. 1917, §§ 4–5 (Jan. 2, 1975), when the briefs were filed during October-December 1975. But as we read § 602(b) of the 1976 amendments, Pub.L. 94–210, 90 Stat. 31, 86 (Feb. 5, 1976), the Special Court, established pursuant to the Act, has been given original and exclusive jurisdiction over civil actions "challenging the constitutionality of this Act or any provision thereof. . . ."

■ 2. The court does have jurisdiction to consider the various contentions in the petitions to review, allegations filed by Timpany and by the States of Pennsylvania and New York, that the regulations of the RSPO are invalid under the governing statute. These regulations pertain to the situation of lines or segments of lines not desired by Conrail as part of its permanent system, but which are so situated that "a financially responsible person"—for the most part states or state agencies—desires continuation of service, at least during a transitional period, and is willing to offer a rail service continuation subsidy sufficient to cover the difference between the "avoidable costs of providing service" on such properties and the "revenues attributable" to the properties plus a "reasonable return on the value" of the properties. Section 304(c) of the Act, 45 U.S.C. § 744(c), prohibits the discontinuance of rail service and abandonment of rail properties where such a subsidy is offered in conformance with the statutory formula, the operative terms of which are determined by RSPO standards issued pursuant to § 205(d)(3) of the Act, id. § 715(d)(3). The challenges in the instant petitions are to RSPO's definition of the terms "avoidable costs" and "reasonable return on value." Section 304(b)–(c) of the Act and the pertinent provisions of the regulations are set forth in an Appendix to this opinion.

3. Pennsylvania and New York attack as contrary to the Act RSPO's definition of "avoidable costs" to include off-branch

---

**2.** As to the premium put on timely implementation of the Final System Plan and the relegation of controversies over payment for the properties to post-conveyance procedures, *see, e. g.,* H.R.Rep. No. 620, 93d Cong., 1st Sess. 54-55 (1973). The 1976 Amendments make clear a similar concern with respect to rail properties not included in the Final System Plan. Thus, in order "to prevent any disruption or loss of rail service at any time after the date of conveyance," § 304(d) of the Act, as amended, Pub.L. 94–210, 90 Stat. 31, 136, § 804 (Feb. 5, 1976), authorizes the ICC "to direct rail service to be provided by any designated railroad or by the trustees of a railroad in reorganization in the region, if a rail service continuation payment has been offered but an applicable operating or lease agreement is not in effect." The ICC issued such an order on March 16, 1976.

**3.** Brief of Petitioner in No. 75–1762 at ix (issue 4). Trustee Timpany's petition for review does not contain an attack on the constitutionality of the Act as such, although such a contention may be subsumed under the claim that RSPO's regulations are "violative of the Fifth Amendment of the Constitution of the United States." Appendix on Behalf of Petitioner in No. 75–1762 at 86a.

costs. We decline to hold the RSPO regulations invalid on their face. We recognize the force of the contentions in the petition filed by the States. But there are important countervailing considerations.

The States' principal contention is that Congress in 1973 adopted by reference the usage of the ICC in its regulations implementing the Rail Passenger Service Act of 1970, 45 U.S.C. §§ 501 ff. The 1970 statute required the ICC to develop regulations for the determination of "avoidable losses" which would apply in the event of impasse between the National Railroad Passenger Corporation (Amtrak) and a railroad as to the final settlement price to be paid to Amtrak by the railroad, which was shifting over its loss-incurring passenger service responsibility. The railroad's "avoidable loss" for 1969, defined by the statute to mean "the avoidable costs of providing passenger service, less revenues attributable thereto," as those terms would be further elaborated by the ICC, provided one of the two bases for the final settlement price.[4] The ICC definitions, apparently keying "avoidable loss" to the "avoidable costs" of providing

the specific passenger service to be abandoned, are set out in the margin.[5]

 There is implicit recognition in the RSPO regulations that its definition of "avoidable costs" was a novel one, and this presents something of an anomaly since the same words—"avoidable costs"—are used by Congress in both statutes. But a word "is not a crystal, transparent and unchanged," for it takes on the hue of its surroundings, so that the same word may mean different things in different sections of the same statute, and certainly in different, though related, statutes. *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372, 376 (1918); *Lamar v. United States,* 240 U.S. 60, 65, 36 S.Ct. 255, 256, 60 L.Ed. 526, 528 (1916). RSPO justified its formulation by noting that the difference in approach was responsive to a difference in context—a shift from payment by carriers enabled to discontinue service, to a subsidy payment to carriers for continued operation. In the interest of time we quote the RSPO's somewhat technical analysis in a footnote, without our restatement.[6] While we do not have the familiarity with the

---

4. Consideration for relief from the carrier's responsibility to provide the service could be either (1) three years of payment of an amount equal to one-third of 50 percent of the fully distributed passenger service deficit of the railroad as reported to the ICC for the year ending December 31, 1969, or (2) 100 percent of the avoidable loss of all intercity rail passenger service operated by the railroad during the period from January 1, 1969, to December 31, 1969 (or 200 percent of the avoidable losses during the same period for intercity service over the routes that Amtrak would actually operate). 45 U.S.C. § 561(a)(2)–(3).

5. § 1123.2 Definitions.
 (a) Avoidable costs are those operating expenses, rents, and taxes listed in the Uniform System of Accounts (title 49 CFR 1200–1201) which can be demonstrated to have been required for the provision of intercity rail passenger service in 1969, which would not have been incurred had such service not been performed.
 (b) Avoidable loss is the excess of avoidable costs of providing intercity rail passenger service over the nonretainable revenues from the same service, pursuant to section 102(6) of the Rail Passenger Service Act of 1970.
 * * * * * *

(d) Solely related expenses are the operating expenses, rents, and taxes which are incurred only for providing a specific service. 49 C.F.R. § 1123.2.

6. RSPO's approach can be gleaned from the following extracts of its discussion of the positions of the various parties:

The estimate for "revenues attributable" will include the same sources of revenues as those required in the standards. These include freight and passenger revenues from all traffic originated or terminated on the branch, existing subsidy payments, overhead traffic and accessorial revenues. All of the data will be presented for the same base year as employed by the Association in the decision-making process (presumably 1973). These data may be adjusted for rate changes. By agreement of the parties, more current figures may be used.

A ratio of the off-branch costs to revenues for the base year will be calculated for each branch. The ratio will be applied to the estimated revenue for the subsidy year to determine the estimated off-branch cost. The off-branch calculation will utilize variable system average costs, short line mileages, and traffic information from the waybill abstract

subject matter that permits expert understanding of the matter, we do have the perception that under the 1970 measure the carrier was paying a one-shot settlement price for terminating the particular service, so that there was room for rigidity in saying that the amount it saved thereby (to be paid to the quasi-public corporation, Amtrak) would be determined completely without regard to the separated service that was being continued by the carrier, and that there is a distinctly different situation when the two services are being continued and integrated by the same operator (Conrail). There is also a difference in legislative purpose. Under the 1970 Act, the emphasis was to take reasonable steps to prevent the departing carrier from obtaining what might be termed an unjust enrichment in giving up its legal burden to provide intercity passenger service. Under the 1974 Act, the emphasis is on reasonable steps to assure that there is an accurate allocation of the burden of continuing short-line .rail operations which were not designated for transfer to Conrail under the Final System Plan but which are desired to be continued by the potential subsidizer.

These differences in context and legislative purpose seem pertinent to us, but we do not rely on them as the complete answer. The legislative history of the 1974 Act on the "avoidable cost" concept, cited to us by petitioners, refers to the "costs directly attributable or solely related to the costs of a particular service, but would not include any portion of the common costs which would not be covered by revenues received by reason of operation of a line." S.Rep. No. 93–601, 93d Cong., 1st Sess. 37 (1973). But we are not referred to anything in the legislative history that requires that these costs be measured by duplication of the ICC regulations under the 1970 law.[7] Indeed, as

files. The Office will computerize the formula and make the calculations available to interested parties.

(40 F.R. 1626).

\* \* \* \* \* \*

The widest range of disagreement between the petitioners arises in the discussion concerning the cost accounts to be included in the standards. Basically, the parties representing railroad interests support full allocation of all costs. The potential subsidizers takes the position that the standards should exclude indirect costs.

The Office agrees that the phrase "avoidable cost" should be strictly construed, but this fact does not necessarily exclude indirect costs. It is important to note that the Act discusses avoidable costs in the context of *providing* the service not of *abandoning* the service. This distinction is significant. Equipment depreciation accounts best illustrate this distinction. As many parties suggest, capital investment is a "sunk cost" and the depreciation thereof, taken from the viewpoint of abandonment, is not an avoidable cost. However, when viewed from the standpoint of a continuing operation, capital investments in equipment must be made from time to time in order to maintain service; and, consequently, depreciation costs for these items would be avoidable. The same principle would also apply to structure depreciation, but, the standards provide that rehabilitation costs be recovered during the period covered by the subsidy agreement. In effect, capital investment in structures is treated as an expense. Each on-branch account has been reviewed and the modifications reflected in the amended standards are summarized below.

(*id.* 1627).

\* \* \* \* \* \*

Some parties challenged the use of the functional service unit costs developed by the application of Rail Form A, as the basis of determining off-branch costs since it utilizes variable costs. They suggest that Rail Form A was not designed to develop avoidable costs and that its use for that purpose is improper. While on the surface it might seem inconsistent to allow system variable costs to be allowed for off-branch costs, it is believed justified on the basis of equity to the railroad since all system revenues from traffic originating or terminating on the branch are attributed to the branch. A failure to recognize off-branch variable costs would probably lead to situations where the operating railroad would try to divert the traffic to another carrier at the earliest possible point regardless of service considerations. This would not only result in circuitous movement and concomitant time delays but would also decrease the revenue attributable to the branch. The adopted approach recognizes the services rendered by the carrier to the branch traffic.

(*id.* 1628).

7. Although not cited to us by counsel, we are not unaware that the House bill, H.R. 9142, used the language "fully distributed costs of handling traffic on such rail properties" in

the Government points out, it is unlikely that Congress intended RSPO to duplicate ICC usage, since the ICC had prior to the passage of the 1970 Act expressed serious doubt as to whether existing accounting practices were sufficiently refined "to permit the ascertainment of all avoidable costs associated with discontinuance cases," S.Rep. No. 91–765, 91st Cong., 2d Sess. 39–40 (1970), and the participating railroads had found the "avoidable loss" concept sufficiently unworkable to elect a potentially more expensive basis for making payments to Amtrak.[8]

■ The question remains whether the RSPO regulations comport with the legislative intent that "avoidable costs" be "directly attributable" or "solely related" to the line or service involved. The petition of the States argues that the RSPO has presented a more liberal view of "avoidable costs," entailing a greater charge on the states seeking to subsidize short-line operations, than Congress intended. Our approach is shaped by what we see as a basic reality, that RSPO was confronted with the obvious fact that unlike the passenger-freight separation under the 1970 Act, where revenues are wholly severable, any calculation of branch revenues from a run that is part on-branch and part off-branch requires some attention to the relationship of both elements. In RSPO's view, the "avoidable costs" of a branch line require a comparison of costs and revenues; and the only presently practicable way of taking

this into account is to assign to the branch line all revenues earned by traffic originating or terminating on the branch, and correspondingly to determine the quantum of off-branch or system costs in producing such revenues. The Government contends that since fixed overhead costs are excluded from RSPO's definition, the only off-branch or system costs attributed to the branch line are those which are unquestionably increased as a result of handling cars originating or terminating on the branch line and are thus "directly attributable" to producing the "revenues received by operation of the line."[9]

The opposing States have not countered RSPO's determination that their suggested alternatives would either be too expensive (a system-wide accounting and reporting system) or too complex to administer (an approach based on the per diem regulations of the ICC),[10] and have not shown that RSPO's approach will require a significantly greater expenditure of state revenues for rail service continuation subsidies than the approaches they advocate. We cannot assume that Congress intended RSPO to accomplish the impossible. And there may be impossibility in substance and in effect even when something can be achieved, but at a cost that wholly outweighs any conceivable benefit. A French proverb cautions that the best should not be the enemy of the good. It is reasonable to assume that Congress did not intend the infeasible perfect to oust the feasible good. *Cf. Environmental Defense Fund, Inc., v. EPA,* 167

---

place of the "avoidable costs" concept, but that the conference substitute which was ultimately enacted incorporated the "avoidable costs" language of the Senate amendment. H.Rep. No. 93–744, 93d Cong., 1st Sess. 61–63 (1973). However, there is no indication in the Senate and Conference Committee reports of reliance on the 1970 statute or the ICC regulations thereunder. What this legislative history suggests is that Congress intended a clear nexus between the revenues attributable to the particular line and the costs incurred in their production, to exclude "any portion of the common costs which would not be covered by revenues received by operation of a line." In our view, and on the basis of the present record, the RSPO regulation is a reasonable attempt at such a calculation. *See* pp. 96–97 *infra.*

**8.** Joint Brief of the United States of America, ICC & RSPO at 58–60.

**9.** *Id.* at 61.

**10.** RSPO found that while a system-wide accounting and reporting system might be desirable "one cannot be justified on the basis of the subsidy program alone," 40 F.R. 1626; and that an approach requiring the identification of car-miles and car-days by car type and application of the per diem rate by car type "would be overly complex to apply" and that the ICC per-diem rates "contain an element of profit," *id.* 14188.

U.S.App.D.C. 71, 77, 510 F.2d 1292, 1298 (1975).

Finally, it counts with us—and we make this explicit to avoid any possible misunderstanding—that as of this juncture we can reject, and do reject, the contention of the petition filed by the States that the RSPO regulation is facially invalid, without prejudice to reconsideration in light of a particularized factual showing as to the consequences of the regulation. We take account of the fact that RSPO sees its approach as interim methodology to set the rail subsidy program in operation, 40 F.R. 1626, and that the regulations themselves make provision for adjustment at the end of the initial subsidy year to reflect the results of actual operation. 49 C.F.R. § 1125.8(f). We also note that petitioner States and other potential subsidizers will not be harmed if the "avoidable costs" standards prove too generous during the initial subsidy year, for as a result of the 1976 amendments the Federal Government will pay 100 percent of the subsidy.[11]

4. The regulations are attacked by Timpany, as trustee in reorganization of the Central Railroad Company of New Jersey, on essentially two grounds.[12] First, the Act prohibits the owner of the railroad from abandoning his road and yet does not give him just compensation for the use of the road, as determined in a judicial proceeding. Second, RSPO's determination in its regulations to premise the "reasonable return on value" component of the subsidies on "net liquidation value," rather than some purportedly fairer basis which takes into account the "assemblage" value of an established rail corridor, sets an unconstitu-

tionally low standard and is contrary to congressional intent.

In general, the issues as to the constitutionality of the § 304(c) procedures and that of the relationship between "net liquidation value" and "fair value" overlap and are questions primarily for development by the Special Court. Putting aside doubts as to our jurisdiction, we see no basis for interjection by this court to enjoin or interfere with the regulations. As Timpany's brief recognizes (at pp. 7–8, 34–36), "net liquidation value" may be "fair value" in some factual settings, although perhaps not in others. The gist of petitioner's complaint is that RSPO has promulgated an inexorable rule of compensation for a "taking" which will fall short of the constitutional minimum in many cases. In our view, petitioner overstates his plight, and his challenge is premature. The regulation's standards are essentially guidelines for resolving through compulsory arbitration impasses between potential subsidizers and the owners of the short-line roads. The regulations have immediate impact in terms of outlining the amounts payable by the states in the event of impasse in negotiations with the carriers. The carrier is temporarily deprived of the right to abandon short-line operations during the period of the subsidy program, with the fee remaining in the estate. If the statute operates to require the owner to make his road available, to lease it, as it were, without the fair return provided by the Constitution—an issue as to which we express no opinion—the contention is one that can be presented to the Court of Claims under the Tucker Act, 28 U.S.C. § 1491. This is a fair corollary of the ruling of the Supreme Court, *Regional Rail Reor-*

---

11. The Federal share is 90 percent for the second subsidy year. Then the program changes, and the 17 states in the Northeast/Midwest Region join a national rail service continuation assistance program, in which states are entitled to funds in proportion to their total rail mileage eligible for assistance. Pub.L. 94–210, 90 Stat. 31, 139–43 §§ 805–806 (Feb. 5, 1976).

12. Petitioner Timpany also challenges RSPO's authority under the Act to determine the con-

tent of a notice of intent to discontinue rail service, and in particular the requirement that cost data be collected and made available for public inspection. We reject this contention as wholly lacking in merit. It is clearly within the delegation of authority to RSPO to ensure the orderly implementation of the subsidy program by requiring railroads obtaining subsidies to collect information necessary to judgments as to future subsidization.

*ganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), adopting the approach of the Special Court, *In Re Penn Central Transportation Co.,* 384 F.Supp. 895 (1974).[13]

\* \* \* \* \* \*

It may be appropriate to add a word on review jurisdiction and venue. This is perhaps the first, but it may well not be the last, case where an ICC order is interrelated with the matters under active consideration by the Special Court, but is reviewable under present statutes in the circuit courts of appeals. There are obvious reasons why a court as busy as the Special Court should not be saddled with possibly over-extensive exclusive jurisdiction. But perhaps there would be a benefit if Congress permitted a transfer jurisdiction, whereby an appropriate case may be transferred from the generalist circuit court of appeals, where the petition to review has been filed, to the Special Court (a district court), if the Special Court accepts the transfer.

The petitions for review are denied.

*So ordered.*

### APPENDIX

Section 304(b) and (c) of the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 744(b)–(c) provided:

(b) Abandonment.—(1) Rail properties over which rail service has been discontinued under subsection (a) of this section may not be abandoned sooner than 120 days after the effective date of such discontinuance except as provided in subsections (c) and (f) of this section. Thereaft-

er, except as provided in subsection (c) of this section, such rail properties may be abandoned upon 30 days' notice in writing to all those required to receive notice under paragraph (2)(C) of subsection (a) of this section.

(2) In any case in which rail properties proposed to be abandoned under this section are designated by the final system plan as rail properties which are suitable for use for other public purposes (including roads or highways, other forms of mass transportation, conservation, and recreation), such rail properties shall not be sold, leased, exchanged, or otherwise disposed of during the 180-day period beginning on the date of notice of proposed abandonment under this section unless such rail properties have first been offered, upon reasonable terms, for acquisition for public purposes.

(c) Limitations.—Rail service may be discontinued and rail properties may be abandoned under subsections (a) and (b) of this section notwithstanding any provision of the Interstate Commerce Act or the constitution or law of any State or the decision of any court or administrative agency of the United States or of any State. No rail service may be discontinued and no rail properties may be abandoned pursuant to this section—

(1) after 2 years from the effective date of the final system plan or more than 2 years after the final payment of any rail service continuation subsidy is received, whichever is later; or

(2) if a shipper, a State, the United States, a local or regional transportation

---

**13.** Although RSPO envisions arbitration along the lines of its subsidy standards to be final and binding "as to the meaning of these standards," 40 F.R. 1629, this does not, and cannot, negate the holding of the Supreme Court and Special Court that Congress by the 1974 Act did not withdraw the Tucker Act remedy ordinarily available for "takings" without "just compensation."

Apparently, the Special Court has been given authority to make awards reflecting the constitutional concerns identified in its opinion. The 1976 amendments empower the Special Court in passing on the fairness and equity of transfers or conveyances pursuant to the Final Sys-

tem Plan to "tak[e] into consideration compensable unconstitutional erosion, if any"; and to include in the "certificates of value" issued to those transferring rail property to Conrail "such amount, if any, as the special court may determine shall be required after taking into consideration compensable unconstitutional erosion, if any," which may occur during bankruptcy proceedings. Pub.L. 94–210, 90 Stat. 31, 105, 111, §§ 610(b), 612(q) (Feb. 5, 1976). These provisions do not pertain to the situation of the short-line roads involved in this case, which were not designated for transfer to Conrail.

authority, or any responsible person offers—

(A) a rail service continuation subsidy which covers the difference between the revenue attributable to such rail properties and the avoidable costs of providing service on such rail properties plus a reasonable return on the value of such rail properties;

(B) a rail service continuation subsidy which is payable pursuant to a lease or agreement with a State, or a local or regional transportation authority, under which financial support was being provided on January 2, 1974, for the continuance of rail passenger service; or

(C) to purchase, pursuant to subsection (d) of this section, such rail properties in order to operate rail service over such properties.

If a rail service continuation subsidy is offered, the government or person offering the subsidy shall enter into an operating agreement with the Corporation or any responsible person (including a government entity) under which the Corporation or such person (including a government entity) will operate rail service over such rail properties and receive the difference between the revenue attributable to such properties and the avoidable costs of providing service on such rail properties and the trustee of any railroad in reorganization shall receive a reasonable rate of return on the value of any rail properties for which a rail service is operated under such subsidy.

The 1976 Amendments do not make any pertinent changes in these provisions.

\* \* \* \* \* \*

The provisions of the regulations issued by the Rail Services Planning Office (RSPO) (40 F.R. 1631 ff.) pertinent to this case are:

§ 1125.3 Interim subsidy payment.

The person offering a subsidy shall offer to pay, in return for the continuation of rail service, an amount computed on the basis of the interim formula described in this section. The interim payment may be adjusted, by agreement of the parties, to take into account factors, such as rate increases and changes in traffic levels which would make the sole use of base year data an inappropriate means of estimating the payment for the subsidy year. The interim formula makes use of estimates of revenues, off-branch costs, on-branch costs and a return on the value of the properties involved. The "base year" for all estimates under this section shall be the same year employed by the United States Railway Association in developing the final system plan pursuant to sections 206 and 207 of the Act.

(a) *Revenues.* The estimated revenues shall include all the sources of revenue described in § 1125.4, computed on the basis of base year data.

(b) *Off-branch costs.* A ratio of off-branch costs to revenues for the base year shall be used to derive the estimate of the off-branch costs for the subsidy year. The base year off-branch costs shall be calculated using the methodology described in § 1125.5(k). If data identifying actual carloads by car type are not available, car type shall be based upon the railroad's best estimate. A ratio shall be developed by applying these costs against the base year revenues. The resulting ratio shall be applied to the revenues estimated in paragraph (a) of this section to develop the estimated off-branch cost for the subsidy year.

§ 1125.5 Avoidable costs of providing service.

The avoidable costs of providing service on a branch are the total of the costs assigned or apportioned to the branch in accordance with this section. All on-branch costs, whether direct or allocated, shall be computed separately for freight and passenger services. Costs apportioned under paragraphs (a) through (k) of this section shall be derived from the latest Form R–1 of the railroad filed with the Commission prior to the conclusion of the subsidy year. Labor costs must be identified separately for all accounts when costs are assigned on a direct basis.

\* \* \* \* \* \*

(k) *Off-branch costs.* (1) Certain terminal costs, line-haul car costs, and interchange costs shall be considered as the off-branch avoidable costs of providing service over the remainder of the railroad's system. These costs shall be computed by applying variable unit costs to the service units attributed to the branch traffic during the subsidy period.

(2) The following through train single line variable unit costs shall be developed by the railroad by applying data contained in its latest Form R–1 filed with the Commission to Rail Form A: cost per carload by car type, modified cost per carload by car type (substitute an intertrain switching cost, separated between mileage and other than mileage cars, for a road train to industry switching cost; and substitute a modified car ownership cost developed in accordance with section 1125.5(j) above using an allowance of two days in the terminal to cover the loaded and empty car movement for the standard car ownership costs; cost per car-mile by car type; cost per ton-mile; and cost per car interchanged, separated between mileage cars and other than mileage cars.

(3) Terminal costs shall be calculated by multiplying the modified costs per carload, by car type, by the total number of carloads originated or terminated on the branch during the subsidy year. To this amount add the regular costs per carload, by car type, times the number of carloads which originate or terminate on the branch that are local to the railroad serving the branch.

(4) The line haul costs shall be calculated by applying the costs per car-mile by car type to the loaded car-miles on the system by car type originated or terminated on the branch during the subsidy year and applying the ton-mile unit cost to the total ton-miles on the system of revenue freight in road service originated or terminated on the branch during the subsidy year and totaling the results.

(5) The interchange costs shall be calculated by multiplying the cost per car interchanged by the number of carloads of traffic interchanged that originated or terminated on the branch.

§ 1125.6 Valuation of rail properties.

The value of the rail properties on a branch shall be determined in accordance with the following:

(a) Only the following properties on a branch may be considered:

(1) Those that are used and useful to provide the rail services requested by the person offering a subsidy.

(2) In the absence of a request for specific services by that person, those properties that are used and useful to provide the rail service performed on the branch at the time the final system plan becomes effective, or if no service was being performed at that time, the services that were last performed on the branch.

(b) The value of the properties shall be their net liquidation value for their highest and best use, consistent with applicable zoning and land use regulations, determined by computing their current market value for other than rail transportation purposes, less all costs of dismantling and disposition of improvement necessary to make the remaining property available for its highest and best use.

(c) If the railroad and person offering a subsidy cannot, within a period of time that either of them considers reasonable after the beginning of negotiations for the payment of the subsidy, agree on the properties that are used and useful or the net liquidation value, or both, the one that considers that a reasonable period of time has elapsed may notify the other of its intention to have the matter arbitrated. Each of the parties shall then appoint a representative and the representatives shall select an arbitrator or arbitrators mutually acceptable to them. The decision of the arbitrator or arbitrators shall be final.

(d) If either party fails to appoint a representative within five days after receiving notice from the other party of its representative, or if the appointed representatives fail, within five days after the last one of them is appointed, to agree

upon a mutually acceptable arbitrator or arbitrators, either party may submit the matter for arbitration to the American Arbitration Association pursuant to its commercial arbitration rules, and the decision of its arbitrator or arbitrators shall be final.

(e) In considering the value of properties under this section, the arbitrator or arbitrators shall consider, among other factors, any bona fide offer for the properties, or a part thereof, recent sales of adjoining or similar properties, and any available appraisals, by a reputable appraiser, of the properties, or a part thereof.

(f) If the person offering a subsidy is a public body, each meeting of an arbitrator or arbitrators with the parties for the purposes of receiving information or evidence or to hear arguments or views shall be open to the public. Any interested member of the public may file written views, argument, or information with the arbitrator or arbitrators at any time within 3 days after the closing of the sessions that are open to the public.