**WESTINGHOUSE ELECTRIC CORPORATION, Petitioner,**

v.

**UNITED STATES NUCLEAR REGULATORY COMMISSION, Respondent.**

**No. 76–1611.**

United States Court of Appeals, Third Circuit.

Argued Jan. 11, 1977.

Decided March 22, 1977.

Frank L. Seamans, John H. Morgan, Barton Z. Cowan, Daniel A. Toole, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for petitioner; Elliot S. Katz, Westinghouse Elec. Corp., Law Dept., Pittsburgh, Pa., of counsel.

Peter L. Strauss, Gen. Counsel, Stephen F. Eilperin, Asst. Gen. Counsel, Stephen S. Ostrach, Atty., U.S. Nuclear Regulatory Com'n, Washington, D.C., Rex. E. Lee, Asst. Atty. Gen., Morton Hollander, Chief, Appellate Section, U.S. Dept. of Justice, Washington, D.C., for respondent.

Before GIBBONS and GARTH, Circuit Judges, and COHEN,* District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

We here consider a petition to review a final order [1] of the United States Nuclear Regulatory Commission (NRC), which in a rulemaking proceeding amended its rules of practice relating to public inspection of documents containing proprietary information. 10 CFR § 2.790. We have jurisdiction by virtue of § 189 of the Atomic Energy Act of 1954 as amended, 42 U.S.C. § 2239 (1970),

* Sitting by designation.

1. 41 Fed.Reg. 11808 *et seq.* (March 22, 1976).

and the Administrative Orders Review Act of 1950, 28 U.S.C. § 2341 *et seq.* (Supp. 1974). The petitioner, Westinghouse Electric Corporation (Westinghouse), contends that NRC lacked authority to promulgate the amended rules. It seeks to have the order set aside because the rules as amended may result in public disclosure of Westinghouse's proprietary information. We deny relief.

## I. PROCEEDINGS IN THE NRC

NRC, the successor to the Atomic Energy Commission, conducts licensing, regulatory, and enforcement functions pursuant to the Atomic Energy Act of 1954 as amended,[2] and the Energy Reorganization Act of 1974.[3] Under these statutes various licenses are required for the possession, distribution or use of nuclear materials.[4] NRC also is authorized to issue construction permits for facilities utilizing nuclear materials.[5] Applicants for licenses or construction permits must submit extensive documentation relating to design of the facility and its equipment, to financial qualifications of the applicant, to the effect of the facility on the environment, and, for antitrust considerations to the applicant's competitive position in the industry.[6] Much of the information submitted by applicants is not in the public domain and is considered proprietary by both NRC and the applicants. The Atomic Energy Act (the "Act") also authorizes NRC to conduct rulemaking proceedings for the purpose of establishing generic rules appropriate to its licensing and regulatory responsibilities.[7] NRC has conducted rulemaking proceedings involving such matters as acceptable design criteria for reactor cooling systems, reactor effluents, and the like. In those proceedings it has received technical, commercial and financial infor-

mation from private parties such as equipment manufacturers, architects, engineers, and owners of facilities. Much of this information is proprietary. NRC also engages in inspection and enforcement activities in which it becomes privy to similar proprietary information.

Westinghouse has as a principal business activity the manufacture and sale of equipment and components for electric power generation and transmission, including nuclear steam generating systems. In connection with various license applications, Westinghouse submits to the NRC extensive proprietary technical information. Westinghouse also participates in NRC rulemaking proceedings, and often submits similar proprietary information in such proceedings. The information which it regards as proprietary, Westinghouse claims, gives it a competitive economic advantage over other manufacturers which would be lost by public disclosure.

In order to promote the development, use and control of atomic energy, Section 161(p) of the Act, 42 U.S.C. § 2201(p), provides:

> In the performance of its functions the Commission is authorized to . . . (p) make, promulgate, issue, rescind, and amend such rules and regulations as may be necessary to carry out the purposes of this chapter.

Acting under this broad grant of rulemaking authority, the Atomic Energy Commission, as early as 1956 promulgated a rule, 10 CFR § 2.790,[8] dealing with the treatment of proprietary information. The 1956 version of 10 CFR § 2.790 provided that all matters of official record in all proceedings, including licensing and rulemaking, would be available for public inspection. The Commission was authorized, however, to withhold any document from public inspection

---

2. 42 U.S.C. § 2011 *et seq.*

3. 42 U.S.C. § 5801 *et seq.* The NRC was established by the Energy Reorganization Act of 1974 which abolished the Atomic Energy Commission (AEC) and transferred to the NRC all licensing and related regulatory functions of the AEC.

4. *E. g.,* 42 U.S.C. §§ 2092, 2093, 2131, 2133.

5. *Id.* at § 2235.

6. *See, e.g.,* 10 CFR § 31.11 *et seq.;* 10 CFR 50.30 *et seq.;* 10 CFR 70.21 *et seq.*

7. 42 U.S.C. § 2201(p).

8. 21 Fed.Reg. 810 (Feb. 4, 1956).

"if disclosure of its contents is not required in the public interest and would adversely affect the interest of a person concerned." [9] In 1972 § 2.790 was amended to read that in deciding whether or not to withhold information from public disclosure ". . . it is the policy of the Commission to achieve an effective balance between legitimate concerns for protection of competitive positions and the right of the public to be fully apprised as to the basis for and effects of proposed licensing actions." [10] In 1973 the NRC's predecessor agency published a notice in the Federal Register that it was contemplating possible changes in the treatment of proprietary information. [11] The notice listed five alternatives under consideration [12] and invited comments. After considering the comments received, the NRC issued a proposed amendment and invited further comments. [13] After considering the comments received in response to the November 22, 1974 notice the NRC promulgated the present § 2.790, the relevant parts of which are quoted in the margin. [14] This petition for review followed.

9. *Id.*

10. 37 Fed.Reg. 15138 (July 28, 1972).

11. 38 Fed.Reg. 31543 (Nov. 15, 1973).

12. The first alternative was to retain the 1972 rule. The second was to amend it to provide additional criteria for determining whether information should be treated as proprietary and withheld from public disclosure. The third was to amend it to provide that no proprietary information could be submitted in a license application. The fourth was to provide that information would be given proprietary treatment by the Commission, only for a limited time. The fifth was to limit the kinds of information that would be given proprietary treatment, to information the release of which would demonstrably harm the competitive position of the owner.

13. 40 Fed.Reg. 40960 (Nov. 22, 1974).

14. Section 2.790 of 10 CFR
§ 2.790 Public inspections, exemptions, requests for withholding.
(a) Subject to the provisions of paragraphs (b), (d), and (e) of this section, final NRC records and documents, including but not limited to correspondence to and from the NRC regarding the issuance, denial, amendment, transfer, renewal, modification, suspension, revocation, or violation of a license, permit, or order, or regarding a rule making proceeding subject to this part shall not, in the absence of a compelling reason for nondisclosure after a balancing of the interests of the person or agency urging nondisclosure and the public interest in disclosure, be exempt from disclosure and will be made available for inspection and copying in the NRC Public Document Room, except for matters that are:

.      .      .      .      .

(4) Trade secrets and commercial or financial information obtained from a person and privileged or confidential:

.      .      .      .      .

(b)(1) A person who proposes that a document or a part be withheld in whole or part from public disclosure on the ground that it contains trade secrets or privileged or confidential commercial or financial information shall submit an application for withholding accompanied by an affidavit which:
(i) Identifies the document or part sought to be withheld and the position of the person making the affidavit, and
(ii) Contains a full statement of the reasons on the basis of which it is claimed that the information should be withheld from public disclosure. Such statement shall address with specificity the considerations listed in paragraph (b)(4) of this section.
In the case of an affidavit submitted by a company, the affidavit shall be executed by an officer or upper-level management official who has been specifically delegated the function of reviewing the information sought to be withheld and authorized to apply for its withholding on behalf of the company. The affidavit shall be executed by the owner of the information, even though the information sought to be withheld is submitted to the Commission by another person. The application and affidavit shall be submitted at the time of filing the information sought to be withheld. The information sought to be withheld shall be incorporated, as far as possible, into a separate paper.
The affiant may designate with appropriate markings information submitted in the affidavit as a trade secret or confidential or privileged commercial or financial information within the meaning of § 9.5(a) (4) of this chapter and such information shall be subject to disclosure only in accordance with the provisions of § 9.12 of this chapter.
(2) A person who submits commercial or financial information believed to be privileged or confidential or a trade secret shall be on notice that it is the policy of the Commission to achieve an effective balance between legitimate concerns for protection of competitive positions and the right of the public to

## II. STRUCTURE AND OPERATION OF AMENDED § 2.790

The amended rule carries forward the basic policy decision of the 1956 and 1972 version, that disclosure of information in NRC files shall be the rule, and nondisclosure the exception; an exception involving "a balancing of interests of the person or agency urging nondisclosure and the public interest in disclosure." [15] The procedure by which NRC strikes that balance, however, differs depending on whether the information is submitted in connection with a license application or a rulemaking proceeding.[16]

Initially, regardless of the nature of the proceeding, a person who proposes that a document or a part be withheld from public be fully apprised as to the bases for and effects of licensing or rule making actions, and that it is within the discretion of the Commission to withhold such information from public disclosure.

(3) The Commission shall determine whether information sought to be withheld from public disclosure pursuant to this paragraph: (i) is a trade secret or confidential or privileged commercial or financial information; and (ii) if so, should be withheld from public disclosure.

(4) In making the determination required by paragraph (b)(3)(i) of this section, the Commission will consider:

(i) Whether the information has been held in confidence by its owner;

(ii) Whether the information is of a type customarily held in confidence by its owner and whether there is a rational basis therefor;

(iii) Whether the information was transmitted to and received by the Commission in confidence;

(iv) Whether the information is available in public sources;

(v) Whether public disclosure of the information sought to be withheld is likely to cause substantial harm to the competitive position of the owner of the information, taking into account the value of the information to the owner; the amount of effort or money, if any, expended by the owner in developing the information; and the ease or difficulty with which the information could be properly acquired or duplicated by others.

(5) If the Commission determines, pursuant to paragraph (b)(4) of this section, that the record or document contains trade secrets or privileged or confidential commercial or financial information, the Commission will then determine (i) whether the right of the public to be fully apprised as to the bases for and effects of the proposed action outweighs the demonstrated concern for protection of a competitive position and (ii) whether the information should be withheld from public disclosure pursuant to this paragraph. If the record or document for which withholding is sought is deemed by the Commission to be irrelevant or unnecessary to the performance of its functions, it shall be returned to the applicant.

(6) Withholding from public inspection shall not affect the right, if any, of persons properly and directly concerned to inspect the document. The Commission may require information claimed to be a trade secret or privileged or confidential commercial or financial information to be subject to inspection: (i) under a protective agreement, by contractor personnel or government officials other than NRC officials; (ii) by the presiding officer in a proceeding; and (iii) under protective order, by parties to a proceeding, pending a decision of the Commission on the matter of whether the information should be made publicly available or when a decision has been made that the information should be withheld from public disclosure. In camera sessions of hearings may be held when the information sought to be withheld is produced or offered in evidence. If the Commission subsequently determines that the information should be disclosed, the information and the transcript of such in camera session will be made publicly available.

(c) If a request for withholding pursuant to paragraph (b) of this section is denied, the Commission will notify an applicant for withholding of the denial with a statement of reasons. The notice of denial will specify a time, not less than thirty (30) days after the date of the notice, when the document will be placed in the Public Document Room. If, within the time specified in the notice, the applicant requests withdrawal of the document, the document will not be placed in the Public Document Room and will be returned to the applicant: Provided, That information submitted in a rule making proceeding which subsequently forms the basis for the final rule will not be withheld from public disclosure by the Commission and will not be returned to the applicant after denial of any application for withholding submitted in connection with that information. If a request for withholding pursuant to paragraph (b) of this section is granted, the Commission will notify the applicant of its determination to withhold the information from public disclosure.

41 Fed.Reg. 1108 (March 22, 1976).

**15.** § 2.790(a).

**16.** § 2.790(c).

disclosure on the ground that it contains proprietary information must submit an application for such withholding supported by an affidavit setting forth the basis of the claim that disclosure should be withheld.[17] The affidavit must address five considerations which NRC must take into account in ruling on the application.[18] On the basis of the affidavit NRC determines whether the information "(i) is a trade secret or confidential or privileged communication; and (ii) if so, should be withheld from public disclosure."[19] In deciding whether trade secrets or privileged or confidential commercial or financial information should be withheld from public disclosure the NRC must determine:

> (i) whether the right of the public to be fully apprised as to the bases for and effects of the proposed action outweighs the demonstrated concern for protection of a competitive position and (ii) whether the information should be withheld from public disclosure pursuant to this paragraph.[20]

If NRC acts favorably on the application for withholding information there are provisions for limited use of the information under a protective agreement or protective order.[21] If the application is denied, NRC must notify the applicant with a statement of reasons for the denial, and must specify a time, not less than thirty days after the date of the notice, when the information will be placed in the "Public Document Room."[22] Prior to that specified time the applicant may request return of the document, and if he does so ". . . the document will not be placed in the Public Document Room and will be returned to the applicant . . .."[23]

Thus an applicant requesting confidentiality has the absolute right to demand the return of any document claimed to contain proprietary information in all NRC proceedings[24] with one exception. As to rulemaking proceedings there is a proviso to the regulation requiring return of the document upon request:

> [I]nformation submitted in a rulemaking proceeding which subsequently forms the basis for the final rule will not be withheld from public disclosure by the Commission and will not be returned to the applicant after denial of any application for withholding submitted in connection with that information.[25]

The proviso is a significant departure from the prior rule. Heretofore NRC claimed the right to balance competing interests on an ad hoc basis in all proceedings. It has now concluded that in rulemaking the public interest in knowing the basis for a final rule always outweighs private interests and requires disclosure.[26]

## III. THE WESTINGHOUSE CHALLENGE

Westinghouse makes three statutory and three constitutional arguments in support of its contention that § 2.790 in its present form is invalid. We will consider these arguments seriatim.

---

17. § 2.790(b)(1).

18. § 2.790(b)(4).

19. § 2.790(b)(3).

20. § 2.790(b)(5).

21. § 2.790(b)(6).

22. § 2.790(c).

23. Id.

24. Once such information is withdrawn it will not be formally considered by the NRC.

25. § 2.790(c).

26. The net effect of the proviso must be decided in light of two other relevant factors. The first is that like other federal administrative agencies NRC lacks self-enforcing subpoena powers. See 42 U.S.C. §§ 2201(c) and 2281. Thus a party having proprietary information useful in a rulemaking proceeding can insist upon judicial enforcement of any agency subpoena requiring the production of such information and thereby obtain pre-submission judicial review. Secondly, NRC must give at least 30 days notice of its rejection of the application to withhold disclosure, and the party affected can in that time seek judicial review pursuant to 42 U.S.C. § 2239 and 28 U.S.C. § 2341 et seq. In such a proceeding this court could, of course, grant pendente lite relief.

(1) § 103(b)(3) of the Atomic Energy Act.

■ The first statutory argument is based upon the provisions of the Atomic Energy Act. Acknowledging that § 161(p) of the Act, quoted above, gives the NRC general rulemaking authority, Westinghouse argues that such authority is circumscribed by the general rule of administrative law that the regulation must be reasonably related to the purpose of the legislation.[27] Specifically, Westinghouse urges that even though NRC has general rulemaking power the promulgation of a rule providing for public disclosure of proprietary information is not reasonably related to the purposes of the Atomic Energy Act. Such an argument is specious in light of the necessity for the NRC to adopt some regulations for determining whether information obtained in its various proceedings is to become public information. In a closely analogous context the Supreme Court, interpreting § 4(j) of the Communications Act of 1934,[28] held valid a Federal Communications Commission procedural rule authorizing disclosure of proprietary information upon a balancing of the public and private interests involved.[29] Certainly then, the general subject matter is one appropriate for administrative agency rulemaking in the absence of some express statutory prohibition.

Westinghouse, however, urges that NRC's § 161(p) authority is limited by § 103(b)(3) of the Atomic Energy Act.[30]

(b) The Commission shall issue such licenses on non-exclusive basis to persons applying therefor . . .

(3) who agree to make available to the Commission such technical information and data concerning activities under such licenses as the Commission may deter-

mine necessary to promote the common defense and security and to protect the health and safety of the public. All such information may be used by the Commission only for the purposes of the common defense and security and to protect the health and safety of the public.

Literally § 103(b)(3) applies only to licensing, not to rulemaking. But Westinghouse urges that the section should, in light of its legislative history, be construed as evidencing an across the board absolute protection of proprietary information except where it is used "for the purposes of the common defense and security and to protect the health and safety of the public." It points out (1) that the test of § 2.790(a), "a balancing of the interests of the person or agency urging nondisclosure and the public interest in disclosure" appears to be broader than is authorized by § 103(b)(3) in licensing matters and (2) that the mandatory disclosure of any information which forms the basis of a final rule appears to be in contradiction of § 103(b)(3) assuming its applicability to rulemaking proceedings.

The Atomic Energy Act of 1954 is the successor to the Atomic Energy Act of 1946.[31] Under § 7(c) of the 1946 Act[32] the Atomic Energy Commission was authorized to issue licenses to parties who:

agree to make available to the Commission such technical information and data concerning their activities pursuant to such licenses as the Commission may determine necessary to encourage similar activities by as many licensees as possible.

Reference in the quoted provision to "as many licenses as possible" takes on added significance from § 11(c) of the 1946 Act,[33] which contains a compulsory licensing provision with respect to patents utilizing fis-

**27.** *E. g., Mourning v. Family Publications Service,* 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Serritella v. Engelman,* 462 F.2d 601, 602 (3d Cir. 1972) (per curiam).

**28.** 47 U.S.C. § 154(j) (1958 ed.).

**29.** *FCC v. Schreiber,* 381 U.S. 279, 289–94, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965); *see Isbrandtsen-Moller Co. v. United States,* 300 U.S. 139, 57 S.Ct. 407, 81 L.Ed. 562 (1937); *Norwe-*

*gian Nitrogen Co. v. United States,* 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933).

**30.** 42 U.S.C. § 2133(b)(3).

**31.** 42 U.S.C. § 1801 *et seq.* (1946).

**32.** *Id.* at § 1807(c).

**33.** *Id.* at § 1811(c).

sionable material or atomic energy. Under § 11(c) the Commission could grant its licensees the right to use inventions disclosed in any such patents, subject to a reasonable royalty rate. The Senate Committee Report on the 1946 Act says of § 7(c):

> The Committee is desirous also that the provision of the bill relating to licensing of atomic energy devices shall not interfere with the development of free competition in the use of atomic energy. Thus the bill provides that licenses on an atomic energy device, once issued, must be made available to all applicants who can meet the safety and security standards of the Commission. Royalties to be paid the patent owners of such devices are provided for in section 11.[34]

The same report says of § 11:

> In order to make the peacetime benefits of atomic energy widely available, the bill provides that the grant of a license under section 7 carries with it the right to use any patented invention or discovery which the Commission has declared to be affected with the public interest. Any such use is subject to the payment of reasonable royalty fees to be determined by the Patent Compensation Board.[35]

Thus the policy of the 1946 Act appears to have been one of maximum disclosure and maximum access by competitors to the disclosed information.

Westinghouse contends that the maximum disclosure policy of the 1946 Act was eliminated in the Atomic Energy Act of 1954 in favor of a policy protecting the proprietary information of private enterprises, except in limited instances involving use of such information for purposes of defense and to protect the health and safe-

ty of the public. In the 1954 Act the Commission's § 7(c) licensing jurisdiction became § 103, and the § 11 compulsory licensing provisions, in expanded form, became § 153.[36] The compulsory licensing principle was continued in § 153 but with the qualification that the applicant must first seek from and be refused a patent license by the patentee, and the further qualification that the Commission must afford the patentee a hearing and make specified findings before ordering compulsory licensing. The disclosure policy of § 7(c) was also substantially modified. The 1954 Act originated in the House of Representatives as H.R. 8862, and in the Senate as S. 3323.[37] In these versions the § 7(c) language "to encourage similar activities by as many licensees as possible" was deleted and language in the present form of the first sentence of § 103(b)(3) substituted. At hearings before the Joint Committee on Atomic Energy, industry representatives, who opposed the prior policy which favored disclosure of proprietary information, urged the while the change in the language of the 1946 Act, by deleting the words "to encourage similar activities by as many licensees as possible" was a step in the right direction, it was not a big enough step.[38] Following the Joint Committee hearing sessions the bills were redrafted.[39] That redraft added the following sentence to § 103(b)(3):

> [A]ll such information may be used by the Commission only for the purposes of common defense and security and to protect the health and safety of the public *and for no other purpose.* (Emphasis added).

There is evidence in the legislative history which indicates that this language was added to express a strong congressional pol-

---

34. S.Rep. No. 1211, 79th Cong., 2d Sess. (1946), reprinted in U.S. Code Cong. & Admin. News, pp. 1327, 1333 (1946).

35. *Id.* at p. 1335.

36. 42 U.S.C. § 2183.

37. 83d Cong., 2d Sess. (1954).

38. *See, e. g.,* Hearings on H.R. 8862 and S. 3323 Before the Joint Committee on Atomic Energy,

83d Cong., 2d Sess., p. 327 (1954) (testimony of General Electric).

39. Committee Print for Use of the Joint Committee on Atomic Energy, Joint Committee on Atomic Energy, 83d Cong., 2d Sess., Draft in Bill Form Incorporating Changes Proposed to be Made in H.R. 8862 and Companion Bill S. 3323 (Comm. Print 1954).

icy against disclosure of proprietary information. During hearings on the redrafted bills, Congressman W. Sterling Cole, Chairman of the Joint Committee on Atomic Energy, explained the purpose for the new language as follows:

> It permits the Commission to use that data, that information, for purposes of the common defense and security but imposes on the Commission an obligation that they shall not pass that information on to outsiders in order to protect the property right, the commercial right, which a licensee as a developer of a new procedure, new idea, should properly have.[39a]

Although the phrase "and for no other purpose" was subsequently deleted, that deletion does not appear to have been intended to alter the congressional policy against nondisclosure of such information.[39b] An additional industry proposal, that the section also provide that licensees be compensated where technical information developed by them is used in a manner prejudicial to their competitive position, was not adopted.[40]

Certainly Westinghouse is correct in contending that the change from § 7(c) of the 1946 Act to § 103(b)(3) of the 1954 Act indicates an intention on the part of Congress to place new restrictions on the Commission's use of information supplied by license applicants. There was clearly a fundamental change in the policy of using licensee information to encourage the entry of new applicants. We are not convinced, however, that § 103(b)(3) was intended to preclude the disclosure of proprietary information in all circumstances.

As we pointed out in Part I above, the Commission adopted a disclosure of information rule as early as February 4, 1956.[41] Although this regulation, the precursor of § 10 CFR 2.790, as amended, did not refer specifically to proprietary information, it did require the AEC to make available for public inspection all matters of official record unless the AEC determined that disclosure was "not required in the public interest and would adversely affect the interest of a person concerned."[42] As a result, it appears to have permitted the disclosure of proprietary information by AEC in some situations. The 1956 language "in the public interest" appears to refer to the "defense or health and safety" exceptions in § 103(b)(3), and the language "the interest of a person concerned" to the proprietary interest of the license applicant. The 1972 version of the rule speaks of "an effective balance between legitimate concerns for protection of competitive positions and the right of the public to be fully apprised of the basis for and effects of proposed licensing action."[43] This version, while it refers to disclosure of the basis for and effects of proposed actions, can be construed as limiting disclosure of proprietary information to defense and health and safety matters as contemplated by § 103(b)(3). Thus beginning one and one-half years after the enactment of the 1954 Act and for the past 21 years, federal regulations have apparently permitted the disclosure by the AEC or NRC of proprietary information, at least in some instances.[44] In addition, the

---

**39a.** 1954 Joint Committee Hearings at 924.

**39b.** There is evidence that the purpose for that deletion was to insure that § 103(b)(3) did not limit the use of such information by the government. *See* 1954 Joint Committee Hearings at 924–25.

**40.** Hearings, note 38 *supra,* at 349–50.

**41.** See text at note 8 *supra.*

**42.** See note 9 *supra.*

**43.** See note 10 *supra.*

**44.** These factors are highly significant for two reasons. First, deference must be given to "a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933). *See also Power Reactor Development Co. v. International Union of Electrical, Radio and Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961) (involving construction of AEA). Second, courts are "obligated to regard as controlling a reasonable, consistently

test for disclosing information in both the 1956 and 1972 versions of § 2.790 are apparently facially consistent with the limiting language of § 103(b)(3). And it is noteworthy that Westinghouse has not suggested that the Commission in applying the 1956 or 1972 rules made disclosures of proprietary information obtained from license applications unrelated to defense and health and safety.

■ The 1976 revision, the rule under review, is in some respects more favorable to the protection of proprietary information than prior versions as there are more complete standards for determining what documents are entitled to protection.[45] The new test for disclosure is:

> whether the right of the public to be fully apprised as to the bases for and effects of the proposed action outweighs the demonstrated concern for protection of a competitive position.[46]

There is no reason to believe that in applying this test NRC will disregard the long-standing congressional policy which disfavors disclosure of proprietary information or that NRC will disclose proprietary information obtained in a licensing proceeding other than such as bears on defense and health and safety. Westinghouse urges that the reference to defense and health and safety in § 103(b)(3) is not an authorization of public disclosure of proprietary information to achieve such goals, but only of its exclusive use by NRC for those purposes. The overriding Congressional purpose of the section, according to Westinghouse, is the absolute protection from public disclosure of all proprietary technical information and know-how developed by a private enterprise and useful to a competitor.

We think this misstates the meaning of § 103(b)(3). Section 103(b)(3) expressly grants the Commission the authority to use information collected to "promote" the common defense and health and safety of the public. In specific instances the disclosure of proprietary information may be totally consistent with the attainment of such goals. The statute elsewhere provides for public participation in licensing proceedings[47] and for judicial review thereof.[48] Health and safety have been overriding concerns in such cases.[49] The provisions of the statute authorizing public participation are intended to help promote the health and safety of the public. Disclosure of proprietary information forming the bases of a decision on a licensing matter may facilitate both informed administrative action and intelligent judicial review. Such use was, we believe, intended by the draftsmen of § 103(b)(3). The section conditions the grant of a license upon an agreement by the applicant that the NRC may disclose its proprietary information to the extent that it bears upon issues of common defense and health and public safety. If NRC proposes to make disclosures which are in the applicant's view broader than § 103(b)(3) authorizes, it can withdraw the document in question or seek pre-disclosure judicial review.

Summarizing, we find no facial inconsistency between the present version of 10 CFR § 2.790 and § 103(b)(3) of the Atomic Energy Act. Applications of the rule in specific instances might violate the policy of § 103(b)(3), but there is no need to anticipate such violations, and ample opportunity for judicial intervention to prevent them.

applied administrative interpretation . . ." *Northern Indiana Public Service Company v. Porter County Chapter of Izaak Walton League,* 423 U.S. 12, 15, 96 S.Ct. 172, 174, 46 L.Ed.2d 156 (1975).

45. See note 18 *supra.*

46. See note 20 *supra.*

47. 42 U.S.C. § 2239(a).

48. *Id.* at § 2239(b).

49. *See, e. g., Power Reactor Development Co. v. International Union of Electrical Radio and Machine Workers,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); *Porter County Ch. of Izaak Walton L. v. Atomic E. Com'n.,* 515 F.2d 513 (7th Cir. 1975); *Crowther v. Seaborg,* 312 F.Supp. 1205 (D.Colo.1970). *See also Blast Endangers 8 at Nuclear Complex,* N.Y. Times, Aug. 31, 1976, at 1, col. 8; *Blast Causes Radiation,* Phila. Evening Bull., Aug. 30, 1976 at 1, col. 8.

As to rulemaking cases, we are not convinced that Congress intended § 103(b)(3) to be a limit upon the agency's rulemaking powers. The 1954 Act is organized into eighteen subchapters. Licensing is dealt with in subchapter 9 and § 103(b)(3) appears there. Subchapter 13 deals with the Commission's general authority, and the rulemaking authority granted in that chapter is part of a long list of general authorizations in § 161. The agency's authority under the Act ranges far beyond the licensing area, and the rulemaking authority contemplates rules "necessary to carry out the purposes of this Act." [50] In this broad grant of rulemaking authority Congress must have intended that the agency be subject to the established general law applicable to administrative agencies, including the case law respecting the protection of proprietary information obtained by compulsory process. But there is no evidence to indicate that § 103(b)(3) is to serve, in any way, as a limit on the Commission's collection or disclosure of information in a rulemaking proceeding. [51] Thus, if NRC obtains proprietary information in a rulemaking proceeding by voluntary submission it is free to disclose that information when it forms the bases for the final rule. And, if the holder of the information declines to submit it voluntarily NRC will be forced to resort to the courts, which will review its balancing of the public and private interests involved.

(2) The Freedom of Information Act.

The second Westinghouse challenge to the NRC rule is based on the Freedom of Information Act. [52] The basic purpose of that statute is to make information in the possession of government agencies available to the public. [53] There are, however, nine statutory exemptions. [54] From one of these, the exemption from disclosure of "trade secrets and commercial or financial information obtained from a person and privileged or confidential . . .," [55] Westinghouse argues that Congress intended a prohibition against all disclosure of such information as well as an exemption from the duty to disclose. In one case against a government agency Westinghouse has successfully asserted that a private party has an implied right of action to challenge the disclosure of information exempt from compulsory disclosure by the Freedom of Information Act. [56] Westinghouse did not urge here that federal principles of judgment preclusion estop the government from contending that the Fourth Circuit Freedom of Information Act case is dispositive of the issues in this case. [57] Probably had such a contention been advanced the *Blonder-Tongue* rule would not control, because the Fourth Circuit case did not actually hold that all information exempted from disclosure under the Freedom of Information Act is also absolutely barred from discretionary voluntary governmental disclosure. [58] Such a decision would, we think, have been foreclosed by *FAA Administrator v. Robertson*,

---

**50.** § 161(p).

**51.** The difference in NRC's statutory power to deal with proprietary information received in rulemaking as opposed to licensing proceedings should not suggest that it was inappropriate for NRC to deal with proprietary information in rulemaking and licensing contexts in the same rule. The procedural safeguards of § 2.790 are equally useful in both contexts, and in either, appear to afford ample opportunity for judicial review prior to disclosure.

**52.** 5 U.S.C. § 552 (Supp.1976).

**53.** *See e. g.,* S.Rep. No. 813, 89th Cong., 1st Sess. 3 (1965); H.R.Rep. No. 1497, 89th Cong., 2d Sess. 1 (1966), U.S. Code Cong. & Admin. News 1966, p. 2418.

**54.** 5 U.S.C. § 552(b) (Supp.1976), amending 5 U.S.C. § 552(b) (1970).

**55.** *Id.* at § 552(b)(4).

**56.** *Westinghouse Electric Corp. v. Schlesinger,* 542 F.2d 1190 (4th Cir. 1976).

**57.** *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *May Dept. Stores, Co. v. Williamson,* 549 F.2d 1147 (8th Cir. 1977). (Lay, J., concurring).

**58.** *See Moore-McCormack Lines v. ITO Corp.,* 508 F.2d 945 (4th Cir. 1974).

422 U.S. 255, 262, 269 n.1, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), holding that the Freedom of Information Act was not intended to repeal by implication statutes which make disclosure a matter of agency discretion. We have held in Part III (1) above that the Atomic Energy Act gives NRC such discretion both in licensing and in rulemaking proceedings. Whether, absent statutory agency authority to release information, we would recognize a private cause of action to prevent disclosure of information covered by a Freedom of Information Act exemption, a question on which other circuits have expressed conflicting views,[59] we need not in this case decide.

### (3) 18 U.S.C. § 1905

■ Westinghouse's final statutory argument is that § 2.790 is invalid because it is inconsistent with 18 U.S.C. § 1905 (1970). That criminal statute prohibits the release by a government employee of information which "concerns or relates to the trade secrets, processes, operations, style of work or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses or expenditures of any person." The prohibition applies, however, only to the "extent not authorized by law." Since we have found § 2.790 to be a validly enacted agency regulation it has the "force of law." [60] Thus any release pursuant to § 2.790 would be "authorized by law."

### (4) Vagueness

■ We turn now to Westinghouse's constitutional arguments. The first is that the

standard in § 2.790(b)(5) for determining disclosure, "whether the right of the public to be fully apprised as to the bases for and the effects of the proposed action outweighs the demonstrated concern for protection of a competitive position . . . ," is unconstitutionally vague. This argument is meritless as the "public interest" standard has always been a constitutionally accepted standard within which administrative agencies may act.[61] Furthermore, in the context of a licensing proceeding that standard is further defined by § 103(b)(3) of the Act, limiting use of the information received from applicants to defense and public health and safety. Westinghouse does not contend that the statutory language is vague. Certainly the standard of § 2.790(b)(5), applied in the licensing context in compliance with § 103(b)(3), gives adequate notice to the applicant of the criteria which will be applied by NRC in ruling on a request for nondisclosure.

In the rulemaking context, in which we have held that § 103(b)(3) does not control, the public interest balancing test is supplemented by the provision in § 2.790(c) that the information may be withdrawn by the applicant unless its revelation is necessary to disclose to the public the "basis for the final rule." We have no trouble understanding, and do not anticipate any difficulty in applying that test. A private enterprise owner of proprietary information making a voluntary submission in a rulemaking proceeding should have no more difficulty than we, since the most likely purpose of such a submission is that it form the basis for the contemplated rule. The owner knows, then, that disclosure may re-

**59.** The Fifth Circuit in *Pennzoil Co. v. FPC,* 534 F.2d 627 (5th Cir. 1976) and the D.C. Circuit in *Charles River Park "A", Inc. v. HUD,* 171 U.S. App.D.C. 286, 519 F.2d 935 (1975) declined to read the Freedom of Information Act exemptions as bars to the disclosure of exempt information. The Ninth Circuit, however, has held that the Freedom of Information Act mandates that exempt information be kept private. *Union Oil Co. of Cal. v. FPC,* 542 F.2d 1036 (9th Cir. 1976). *See generally* Note, Reverse-Freedom of Information Act Suits: Confidential Information in Search of Protection, 70 Nw.U.L. Rev. 95 (1976); Note, Protection From Govern-

ment Disclosure—The Reverse—FOIA Suit, 1976 Duke L.J. 330 (1976).

**60.** *See e. g., Public Utilities Comm. v. United States,* 355 U.S. 534, 542, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958).

**61.** *See, e. g., New York Central Securities Co. v. United States,* 287 U.S. 12, 24, 53 S.Ct. 45, 77 L.Ed. 138 (1932); *FAA Administrator v. Robertson,* 422 U.S. 255, 269 n.1, 95 S.Ct. 2140, 45 L.Ed. 164 (1975) (Stewart, J., concurring); *FCC v. Schreiber,* 381 U.S. 279, 296, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965).

sult. He can if he fears that result refrain from making a voluntary submission and let NRC seek judicial enforcement of a subpoena for any information which it desires.

### (5) Unconstitutional Conditions

█ Relying on *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), Westinghouse urges that § 2.790 has imposed an unconstitutional condition upon its right to participate in NRC rulemaking and licensing proceedings in a meaningful way. Oddly, it does not argue that § 103(b)(3), which directly imposes on all licensees the condition that they agree to the use of the information by the Commission for the common defense and health and safety of the public, is unconstitutional. Since the regulation does not in the licensing context enlarge the disclosures permitted by the statute, we fail to see why a challenge to the rule in that context should be entertained.

█ As to rulemaking, the major premise of the Westinghouse argument is that it has a due process right to participate in such a proceeding. To exercise its right to participate it may either submit proprietary information and risk disclosure, or elect not to submit it and run the risk that the agency rulemaking body will make a less informed decision. The suggested conclusion is that this is a Hobson's choice, prohibited by the unconstitutional condition caselaw. The syllogism has a surface appeal, but will not stand in depth scrutiny. It is true that due process requires an opportunity for interested parties to be heard in rulemaking proceedings in many circumstances. But it is not true that due process requires the opportunity to be heard in secret, thereby depriving other interested parties of the opportunity to know the basis of an administrative agency's decision. A proprietor of information who thinks that information will significantly affect the decision on a proposed rule is free to submit it, but not under conditions which will in effect deprive other interested parties of the opportunity to challenge it before the agency or upon judicial review.[62]

### (6) Uncompensated Taking

█ The final objection Westinghouse presses is that § 2.790 authorizes an uncompensated taking of its property in the form of its proprietary information without compensation in violation of the taking clause of the Fifth Amendment. In most situations in which § 2.790 applies this argument is fanciful. A voluntary submission of information by an applicant seeking the economic advantages of a license can hardly be called a taking. And a voluntary submission of information by a private enterprise in a rulemaking proceeding is not likely in the absence of hope of similar economic advantage. The only instance in which a taking of proprietary information might occur is the involuntary use of proprietary information in a rulemaking proceeding (or perhaps as a witness in a licensing or adjudicatory proceeding) pursuant to compulsory process. Since NRC lacks the power to issue self-enforcing compulsory process there is no way that its disclosure rules could run afoul of the Fifth Amendment taking clause.[63]

---

**62.** *See Schreiber, supra,* 381 U.S. at 289–94, 85 S.Ct. 1459.

**63.** The NRC brief asserts a broad governmental power *to* destroy private property for overriding interests of national security, citing *United States v. Caltex,* 344 U.S. 149, 154, 73 S.Ct. 200, 97 L.Ed. 157 (1952). We do not rely on *Caltex.* Whether that extreme assertion of sovereign power in a democracy has outlived the peculiar times in which it was written need not concern us. If, in a judicial proceeding to enforce disclosure of proprietary information, a court should order disclosure, the more apt precedent than *Caltex,* we suspect will be the Regional Rail Reorganization Act Cases, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), which recognize a federal government obligation to pay appropriate compensation and a Tucker Act remedy.

## IV. CONCLUSION

None of the six grounds upon which Westinghouse challenges the amendments to § 2.790 is meritorious. The petition for review will be denied.