PETROLITE CORPORATION, Plaintiff,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.

Civ. A. No. 80–0798.

United States District Court, District of Columbia.

June 25, 1981.

Gerald E. Gilbert, Patrick M. Raher, David J. Hayes, Washington, D. C., for plaintiff.

Patrick J. Cafferty, Jr., U. S. Dept. of Justice, Ky P. Ewing, Jr., Washington, D. C., for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Plaintiff, a producer of specialty chemical products, challenges the constitutionality of the 1978 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136–136y. FIFRA regulates the distribution and marketing of pes-

ticides by requiring any prospective supplier to obtain a registration for its pesticide from the Environmental Protection Agency (EPA). To secure such a registration, the manufacturer must submit sufficient test data in support of its application to convince EPA that the chemical is both safe and efficacious. Specifically at issue in this action are two provisions of FIFRA governing the conduct of EPA with regard to data submitted in support of a registration application: section 136a(c)(1)(D), which provides that in certain circumstances EPA may consider data submitted by one applicant in support of a subsequent application by another applicant for registration of the same pesticide; and section 136h(d), which permits EPA to disclose publicly specified test data.

Plaintiff seeks a preliminary injunction restraining EPA from disclosing or considering in other applications data plaintiff has submitted, on two[1] grounds: (1) that the statute effects an unconstitutional taking of private property either for a private purpose or, alternatively, without just compensation; and (2) that it violates the due process clause of the Fifth Amendment by virtue of both its procedural and its retroactive provisions.

The government has responded with a motion for summary judgment, and, after extensive briefing and an oral hearing on the motions, the Court disposes of all issues in this Memorandum.

## I

Prior to 1972, FIFRA was silent on the question of the use of submitted data to support the registration of other applicants' pesticides.[2] In that year, Congress amended the Act to convert it into a comprehensive regulatory statute governing the use of pesticides, and for the first time it legislated on both the use and the disclosure of data.[3] Section 10 of the 1972 Act allowed applicants to designate portions of submitted data they considered trade secrets (or confidential commercial or financial information), and it prohibited EPA from publicly disclosing any such information. The statute further provided that no trade secret data the public disclosure of which was prohibited by section 10 could be used in support of another registration application.[4] Curiously, the 1972 amendment did not specify any effective date, but that deficiency was remedied in 1975, when Congress amended the statute again to mandate that the 1972 use and disclosure provisions applied only to data submitted on or after January 1, 1970.[5]

In 1978, Congress comprehensively revised the FIFRA disclosure and use provisions,[6] changing both the disclosure and use sections. The disclosure prohibition was narrowed from the 1972 provision (which had been interpreted by the courts to cover all "trade secrets," as that term is defined in the Restatement of Torts) to a ban on disclosure of three specific types of information: manufacturing processes, inert ingredients, and methods for testing for such

---

1. Plaintiff also claims that the statutory provisions violate the requirement of the Administrative Procedure Act (APA) (5 U.S.C. § 706(2)(A)) that agencies must act "in accordance with law." However, since the APA claim is grounded in the unconstitutional taking and due process arguments, it is not necessary for the Court to consider the APA claim independently of the other arguments.

2. Indeed, the Supreme Court held in *Mobay Chemical Corp. v. Costle*, 439 U.S. 320, 99 S.Ct. 644, 58 L.Ed.2d 549 (1979), that consideration of such data occurred as a result of agency practice, not statute. Cf. *Mobay Chemical Corp. v. Costle*, 517 F.Supp. 254, 267 n. 11 (W.D.Pa.1981). The government has indicated, without dispute, that prior to 1972—also as a matter of agency practice, not statute—it did

not publicly disclose test data submitted for registration purposes.

3. Federal Environmental Pesticide Control Act, Pub.L.No.92–516, 86 Stat. 973.

4. All other data could be so considered, but only if the applicant offered the original submitter of the data compensation for its use, to be either negotiated between the parties or fixed by EPA, subject to limited judicial review. See section 3(c)(1)(D) of the Act.

5. Pub.L.No.94–140, 89 Stat. 751.

6. Federal Pesticide Act of 1978, Pub.L.No.95–396, 92 Stat. 819.

ingredients.[7] Insofar as use is concerned, the amended statute divided data into three categories. The first classification, data submitted in support of pesticides registered after September 30, 1978, was granted a period of exclusive use for ten years from the date of the registration. The second group, data submitted after December 31, 1969, was provided a period of fifteen years of use only with compensation, either by negotiation or through mandatory, binding, and nonreviewable arbitration. The third category of data, for which the periods of exclusive use and compensation under the statute had expired, were made available for unlimited use.

The rough net effect of this arrangement was to establish a middle ground between the pre-1972 unlimited use provision and the exclusive use stipulation, requiring permanent compensation, of the 1972 amendment. For all future registrations, the original data submitter would be entitled to ten years of exclusive use and five years of mandatory compensated licensing, to be followed by unlimited use in perpetuity. The 1978 scheme handled the transition problem by stipulating that data submitted between 1970 and 1978 would qualify for future compensation to the extent necessary to provide a total compensation period of fifteen years from registration. Data submitted before 1970, and hence previously unregulated by statute, but considered freely by agency practice (see note 2 *supra*), remained available for unlimited use without compensation.[8] Finally, the 1978 statute eliminated any exemptions from these use provisions for trade secret or proprietary data.

Plaintiff's challenges to the 1978 amendments go to both the use and the disclosure provisions of the statute. It seeks to restrain EPA both from issuing registrations for chemicals to plaintiff's competitors based in part on data submitted by plaintiff to EPA and from the disclosing plaintiff's test data. Plaintiff has not stated expressly that the specific test data at issue span all three categories of the 1978 statute,[9] but from the thrust and scope of the legal arguments presented by the parties, it may be inferred that they do, and that therefore the constitutionality of the use and disclosure provisions of the statute are before the Court in their entirety.[10]

## II

With regard to the provisions allowing the consideration of submitted data to sup-

7.  7 U.S.C. § 136h(d). Even for those categories of information, the statute provided for disclosure when necessary to protect public health or the environment. In any event, the statute allowed generally the disclosure of hazard and efficacy testing data without respect to its status under the Restatement definition of trade secrets.

8.  Plaintiff disputes this interpretation of the third category established by the 1978 statute, arguing that Congress's use of the language "after expiration of any period of exclusive use or compensation" to characterize this material necessarily excludes data submitted before 1970, for which there is no period that could so expire. However, a fair reading of the statute suggests that Congress intended the third category of data to include all those not in either of the other two categories, irrespective of whether so because their period of protection had run or because they had no such protection. Any remaining doubt on that score is removed by examination of the legislative history, which demonstrates a congressional intent to allow unlimited, uncompensated use of pre-1970 data. Plaintiff's related contention—that the Supreme Court held in *Mobay, supra*, that the

1978 amendments did not address the issue of pre-1970 data—is entirely without merit, as the opinion clearly passes upon only the 1972 and 1975 amendments (439 U.S. at 320, 99 S.Ct. at 644). The language of the 1978 statute is wholly dissimilar. *Accord Chevron Chemical Co. v. Costle*, 499 F.Supp. 732, 738–40 (D.Del.1980), *aff'd* 641 F.2d 104 (3rd Cir. 1981).

9.  See Complaint for Declaratory Judgment, Preliminary and Permanent Injunction at 8.

10.  The government has informed plaintiff that it intends to approve registration applications of two competitors of plaintiff's that relied solely upon previously submitted data, including that submitted by plaintiff. The Court believes that the factual context of this case is adequately developed to meet the standard of ripeness in takings questions reiterated by the Supreme Court recently in *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, —— U.S. ——, —— – ——, 101 S.Ct. 2352, 2367–2371, 69 L.Ed.2d 1 (1981). In any event, the government has not argued that the takings issue is not ripe for adjudication.

port subsequent applications, plaintiff claims that the statute's treatment of each category of data constitutes a taking of private property either for a private purpose or, if for a public purpose, without just compensation, in violation of the Fifth Amendment.

It is customary to begin an analysis of a takings issue by determining whether a bona fide property right exists, because in the absence of such an entitlement there can be no constitutional violation. In a recent case in which the identical use conditions of the 1978 statute at issue here were challenged, the Court of Appeals for the Third Circuit held that there is no property right to non-use by the government of data voluntarily submitted to it, and on that basis it dismissed the challenge to the statute without further inquiry. See *Chevron, supra*, 641 F.2d at 114–16; see also, *Mobay Chemical Corp. v. Costle*, 517 F.Supp. 254 at 267 (W.D.Pa.1981). Although the reasoning in *Chevron* may well be sound, in the view of this Court the existence *vel non* of a property interest is a difficult and close question that need not be addressed to resolve the pending motions. Instead, this Memorandum assumes *arguendo* that there is a valid property right at stake and proceeds to what the Court conceives to be the least troublesome legally of the three [11] major questions involved—whether the use of submitted data by EPA constitutes a taking.

### III

To resolve whether the statute works a taking of property, the three categories of data must be analyzed separately, not only because the statute treats them differently, but also because plaintiff's expectations concerning their treatment reasonably may have differed.

Under recent Supreme Court doctrine, primary among the considerations to be applied to the determination of whether governmental action constitutes a taking are whether "the interference with property can be characterized as a physical invasion by government," and "the extent to which the regulation has interfered with distinct investment-backed expectations." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). None of the governmental actions challenged by plaintiff constitutes a "physical invasion," of course, and the question therefore arises whether the regulation has interfered with distinct investment-backed expectations.

■ Data submitted in support of registrations after September 30, 1978, the effective date of the 1978 amendment, were granted ten years of exclusive use and five subsequent years of compensated use. Obviously, the use provisions for post-1978 data, being entirely prospective in nature, can hardly be said to have interfered to any significant extent with such expectations. The provisions are typical of many that apply to new areas of business regulation in which the government conditions the future right to conduct a particular line of business upon fulfillment of specified requirements. As the Court of Appeals for the

---

11. The third question involves the applicability of the Tucker Act, 28 U.S.C. § 1491. The government has argued that the Court need not decide whether use of submitted data constitutes a taking unless it has first determined that the statute withdraws a remedy under the Tucker Act. This approach, sanctioned by the Supreme Court in *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 94 n. 39, 98 S.Ct. 2620, 2641 n. 39, 57 L.Ed.2d 595 (1978), derives from the fact that if the Tucker Act is available to provide "just compensation" and if the alleged taking is for a public purpose, the governmental action is immune from constitutional challenge, regardless of whether it amounts to a taking. Although this route was used in a similar challenge to the 1975 FIFRA amendments, see *Dow Chemical Co. v. Costle*, 464 F.Supp. 395, 399 (E.D.Mich.1978), the Court believes it is preferable to address in this instance the takings issue first, because the Tucker Act issue—like the property right issue—may be a closer and more intractable question than the takings matter. Suffice it to say that were it to take a position on the Tucker Act issue, this Court would probably follow the analysis of the district court in *Chevron, supra*, 499 F.Supp. at 742–43, and conclude that plaintiff's likelihood of succeeding on the merits on the Tucker Act issue is not great.

Third Circuit stated in response to a recent constitutional challenge to provisions requiring the disclosure of proprietary data in the nuclear power industry, "A voluntary submission of information by an applicant seeking the economic advantages of a license can hardly be called a taking." *Westinghouse Electric Corp. v. Nuclear Regulatory Commission*, 555 F.2d 82, 95 (3d Cir. 1977). Plaintiff was free to refrain from submitting data after passage of the 1978 amendments, and its voluntary decision to continue to submit data and to attempt to secure registration after that date precludes it from claiming a government taking.[12]

■ As concerns the retroactive use provisions of the 1978 law,[13] they did no more than to ratify prior practice (see p. 968 *supra*). Plaintiff has adduced no evidence indicating that the development and submission of this data preceded in time the adoption of the agency practice of using the data in subsequent applications. In the absence of even a colorable allegation that plaintiff's reasonably "investment-backed expectations" were disrupted by Congress's statutory ratification of long-standing agency practice, its takings argument must be rejected.

■ Finally, the 1978 amendments altered the treatment of data submitted between 1970 and 1978. Certainly, the statute retroactively decreased the protection accorded these data—from perpetual compensation for use of any data and perpetual exclusive use of trade secret data to limited periods of exclusive and compensated use of all data (including trade secrets). On that basis, plaintiff can claim disappointment of its settled expectations, with at least some deleterious economic consequences. The question, then, is whether this is a case in which "'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons,"[14] or whether it merely represents a manifestation of the type of situation characterized by the observation that "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."[15]

Among the factors which are appropriately considered in resolving this question, in addition to those noted above, are whether the government regulation amounted merely to "the denial of one traditional property right," out of "a full 'bundle' of property rights," rather than to the destruction of all traditional rights;[16] whether there was merely a reduction in the most lucrative use of the property;[17] and whether the regulations have rendered the plaintiff "unable to derive economic benefit" from the property, or, alternatively, whether it was able to obtain a "reasonable return" on its property.[18] It is in light of these general standards that plaintiff's claim must be evaluated.

First, not only is there no physical invasion of plaintiff's property, but there is not even any restraint on permitted uses that it may make of its property. To be sure, by liberalizing the use provisions the govern-

**12.** This conclusion is buttressed by the Court's conclusion *infra* with regard to other categories of data in the 1978 amendments. "[O]ur determination that no property right subsisted before the 1972 and subsequent amendments to the Pesticide Act, also leads us to conclude that Congress, having conferred a property right to which the chemical companies had no prior claim, may condition that right to accommodate agency practice." *Chevron, supra*, 641 F.2d at 117 n. 29.

**13.** The government's contention that none of the 1978 provisions operates retroactively is clearly without merit. See *Chevron, supra*, 499 F.Supp. at 744.

**14.** *Penn Central, supra*, 438 U.S. at 124, 98 S.Ct. at 2659.

**15.** *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922).

**16.** *Andrus v. Allard*, 444 U.S. 51, 65–66, 100 S.Ct. 318, 326–327, 62 L.Ed.2d 210 (1979).

**17.** *Id.* at 66, 100 S.Ct. at 327.

**18.** *Penn Central, supra*, 438 U.S. at 136, 98 S.Ct. at 2665; *Allard, supra*, 444 U.S. at 66, 100 S.Ct. at 327.

ment has rendered one use of the data—licensing it to competitors, either by voluntary agreement or by operation of statute—more difficult or, in certain situations, impossible. But this interference amounts to a preclusion of merely one financial use among many, and for that reason it establishes nothing more than a diminution in the value of plaintiff's data.

It is noteworthy in this connection that plaintiff has not attempted to argue that the 1978 provisions destroyed its ability to earn a reasonable return on its investment in hazard and efficiency data.[19] Considering the recent vintage of statutory restrictions on the use of data and plaintiff's longstanding involvement in this field, it appears uncontrovertible that plaintiff's primary "investment-backed expectations" concerned the use of data in support of its own applications, not those of others. Moreover, Congress did not, in enacting the 1978 statute, eliminate all protection for data submitted between 1970 and 1978. Instead, it replaced terms authorizing unlimited use of non-trade secret data with a provision allowing the use of all data with compensation for fifteen years. Thus, as in *Penn Central, supra,* 438 U.S. at 137, 98 S.Ct. at 2665, plaintiff has not even been wholly deprived of the one strand of its bundle of property interests affected.[20] The provision of valuable replacement rights—in the instant case through a fifteen-year period of compensation, and in

*Penn Central* through transferable development rights—mitigates the financial burden of the government action and must be considered in assessing the extent of the government's interference with plaintiff's property.

■ The interference with plaintiff's property is, considered as a whole, insignificant relative to those in which the Supreme Court has found no taking.[21] Thus, this governmental action, like others before it, must be chalked up to the costs individuals must bear to secure "the advantage of living and doing business in a civilized community." *Pennsylvania Coal Co., supra,* 260 U.S. at 422, 43 S.Ct. at 163 (Brandeis, J., dissenting).

### IV

■ The second takings claim concerns the disclosure provisions. Here, too, examination of the constitutionality of the disclosure terms must be separated into the prospective and the retroactive aspects. Because the disclosure of data submitted to the government after the effective date of the statute authorizing the disclosure cannot conceivably be regarded as interfering with investment-backed expectations, plaintiff's challenge to the 1978 statute's narrowing of the privilege for post-1978 data cannot be sustained. The retroactive features of the amendment present a closer question, particularly because prior to 1972

**19.** Such a claim would be untenable in any event, inasmuch as plaintiff has indicated that it submitted data to the government before 1970, when no restrictions on use were in effect. Presumably, plaintiff expected that it would earn a reasonable return on its investment in that data.

**20.** See Comment, FIFRA and the "Taking" of Trade Secrets, 8 B.C.Envt'l.Aff.L.Rev. 593, 613, 633 (1980).

**21.** In *Allard, supra,* plaintiffs were challenging the constitutionality of a criminal statute making it unlawful to sell eagles or parts of eagles, even if they were lawfully acquired before passage of the law. The Supreme Court held, citing wartime Prohibition cases, that enforcement of the law did not constitute a taking, suggesting that plaintiffs, who were engaged in the Indian artifact business, retained the rights

to possess, transport, donate, or devise the bird parts and "might exhibit the artifacts for an admissions charge." *Allard, supra,* 444 U.S. at 66, 100 S.Ct. at 327. Similarly, in one of the cited Prohibition cases, the court, in dismissing a takings challenge to a federal law banning the sale of alcoholic beverages on hand when the law was passed, noted that the beverage owner "retained the ability to export his product or to sell it domestically for purposes other than consumption." *Allard, supra,* at 67 n. 24, 100 S.Ct. at 328 n. 24, *citing Hamilton v. Kentucky Distilleries Co.,* 251 U.S. 146, 157, 40 S.Ct. 106, 108, 64 L.Ed. 194 (1919). In the instant case, plaintiff retains far greater opportunity to profit financially from the data it has submitted to the government than do dealers in bird artifacts or alcoholic beverages after the sale of their products has been banned.

the government had refrained from disclosing trade secret data submitted to it. Nevertheless, the Court concludes that the disclosure provisions do not constitute a taking even in their retroactive application.

Plaintiff has not adequately refuted the natural assumption that it generated and submitted its data primarily for the development and registration of its products, without regard to potential subsequent disclosure. Moreover, it has made no showing that the disclosure of its hazard and efficacy data pursuant to statute destroys its ability to earn a reasonable return from its investment in this data. At most, it will suffer a loss in profits as a result of the disclosure, but under *Allard*, and in these circumstances, such a loss does not constitute a taking.[22] In this regard, it is significant, too, that the 1978 provisions did not eliminate all protection from disclosure of data, but merely narrowed the categories of privileged data with specific exemptions. Such an approach mitigates the retroactive impact of the statute and attenuates even further plaintiff's claim of a taking.

Although none of the cases cited by the parties is directly on point, the mandatory labeling cases lend significant support to the government's position.[23] *Corn Products Refining Co. v. Eddy*, 249 U.S. 427, 39 S.Ct. 325, 63 L.Ed. 689 (1919), concerned a constitutional challenge to a state statute requiring the labeling of ingredients in table syrups. The Supreme Court stated (249 U.S. at 431, 39 S.Ct. at 327) that a "manufacturer or vendor has no constitutional right to sell goods without giving to the purchaser fair information of what it is that is being sold." This holding was broadened in *National Fertilizer Association v. Bradley*, 301 U.S. 178, 57 S.Ct. 748, 81 L.Ed. 990 (1937), which sustained the retroactive regulation of products manufactured before enactment of the regulating statute.

Additionally, the government has catalogued numerous federal regulatory statutes which authorize or require the disclosure of trade secret data submitted to the government. See Memorandum in Support of Defendants' Motion for Summary Judgment at 46 n. 37. In enacting these provisions, which concern health, safety, and environmental protection, Congress has established specific mechanisms for balancing the interests of private firms in proprietary information and the public's interest in learning of the potential dangers and risks to which they may be subjected. Plaintiff's argument, if sustained, might preclude the enforcement of all of these statutes[24] because the trade-off legislated by Congress in each case does not furnish absolute immunity from disclosure of all trade secrets as defined by the Restatement of Torts. In the words of the Supreme Court, *Allard, supra*, 444 U.S. at 65, 100 S.Ct. at 326, "To require compensation in all such circumstances would effectively compel the government to regulate by *purchase*."[25]

---

22. See *Westinghouse Electric Corp., supra*, 555 F.2d at 95.

23. See *Mobay Chemical Corp. v. Costle*, 517 F.Supp. 254 at 270 (W.D.Pa.1981). Plaintiff's reliance upon *Wearly v. Federal Trade Commission*, 462 F.Supp. 589 (D.N.J.1978), vacated, 616 F.2d 662 (3d Cir. 1980), is misplaced, both because the district court opinion, not controlling in any case, was vacated, and because it is inapposite. *Wearly* concerned the obligation of the government to protect from disclosure under the Freedom of Information Act and other statutes trade secrets given to it under the compulsion of a subpoena. The government's duty to respect the privileged character of information whose provision it compels does not extend to its treatment of information voluntarily provided to it by a firm wishing to engage in a line of business regulated by the government.

See McCarthy & Kornmeier, Maintaining the Confidentiality of Confidential Business Information Submitted to the Federal Government, 36 Bus.Law. 57, 72 (1980); *Westinghouse Electric Corp., supra*, 555 F.2d at 95.

24. Presumably, it would bar their enforcement without the payment of compensation.

25. Even if the Court were incorrect in its conclusion that the disclosure provisions do not constitute a taking, plaintiff would not necessarily be entitled to relief in this Court. Although the Court does not decide the issue of the availability of a damage remedy under the Tucker Act (see note 11 *supra*), it is worth noting that plaintiff's arguments supporting its claim that Congress intended to withdraw such a remedy affect only the use provisions of the statute. The arbitrated compensation terms of

## V

Plaintiff's other claims can be disposed of more briefly. Plaintiff contends that application of the 1978 amendments would deprive it of property without due process of law. The due process argument has two facets: plaintiff contends that the provisions retroactively destroy vested property rights, and that the failure of the statute to provide adequate notice violates procedural due process. As to the former claim, the burden is on plaintiff to demonstrate that the statute operates irrationally. *Williamson v. Lee Optical Co.*, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955). Although statutes that operate retroactively must be examined with particular care to determine whether their retroactive features are themselves irrational or arbitrary,[26] the retroactive aspects of the 1978 amendments do not pose anything resembling a close question. The legislative history of the statute demonstrates that Congress thoughtfully and thoroughly considered the deficiencies in the pesticide registration program and legislated a careful scheme to provide the optimal accommodation, in its view, between competition and innovation in the industry. See, *e. g.*, Memorandum in Support of Defendants' Motion for Summary Judgment at 35–38. The retroactive provisions are a rational means for effectuating Congress's intent that the registration program be made more efficient and speedy, that increased competition be provided in the industry, and that potential hazards be disclosed to the public. Having established the rational relationship between Congress's goals and the means it chose to implement them, the Court's investigation is at an end.

Plaintiff's procedural due process claim fails as well. Once the Court has concluded that the 1978 statute does not effect a taking of private property without just compensation or an interference with vested property rights, plaintiff's claim that the government must accord it notice and a hearing before each disclosure or use of its data obviously cannot be sustained.[27]

## VI

Plaintiff has failed to establish any of the elements comprising the standard for preliminary relief in this Circuit. The Court has concluded that the challenged statute does not effect a taking. Even if it were incorrect on this issue, plaintiff could prevail only if it were able to demonstrate that the taking was for a private purpose—a claim that is patently frivolous—or that the Tucker Act remedy had been withdrawn—a position that is chancy. For these reasons, the Court concludes that plaintiff's likelihood of success on the merits are remote. Additionally, since damages would appear to be a satisfactory remedy, plaintiff has not begun to show irreparable injury; the balance of harms do not clearly go plaintiff's way;[28] and the public interest favors implementation of the congressional scheme embodied in the 1978 amendments.

The government has moved for summary judgment. The material facts that, according to plaintiff, remain in dispute are either legal conclusions or are immaterial to the Court's determinations. The Court there-

---

the law do not concern the disclosure of data, and plaintiff has suggested no other support for its claim that a Tucker Act remedy would be inconsistent with the statute.

**26.** *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16–17, 96 S.Ct. 2882, 2892–2893, 49 L.Ed.2d 752 (1976).

**27.** The statute does, in fact, require (7 U.S.C. § 136h(d)(3)) notice and reviewability in the event EPA proposes to disclose any data that it may not be authorized to disclose under the law, see 7 U.S.C. § 136h(d)(1) and (2), thereby satisfying due process considerations with regard to these disputes. See *Pharmaceutical*

*Mfr's. Assn. v. Weinburger*, 411 F.Supp. 576, 578–79 (D.D.C.1976). The government is not obligated, however, to give plaintiff an advance opportunity to litigate the constitutional claims advanced and rejected in this action in the context of each proposed use or disclosure of plaintiff's data.

**28.** Competitors of plaintiff's allege that they are seriously injured by EPA's failure, pending the disposition of motions considered herein, to implement fully the use and disclosure provisions of the amended Act. See, *e. g.*, Motion of Champion Chemicals, Inc. to Intervene.

fore concludes that there are no genuine issues of material fact, and that defendant is entitled to judgment as a matter of law.