CHEVRON CHEMICAL COMPANY, a
corporation, Plaintiff,

v.

Douglas M. COSTLE, Administrator,
United States Environmental Pro-
tection Agency, Defendant.

Civ. A. No. 79–532.

United States District Court,
D. Delaware.

June 5, 1980.

Richard J. Abrams, Richards, Layton & Finger, Wilmington, Del., for plaintiff; Anthony P. Brown, C. Douglas Floyd, and Brian D. Bellardo, Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel.

James W. Garvin, Jr., U.S. Atty. and Peggy L. Ableman, Asst. U.S. Atty., Dept. of Justice, Wilmington, Del., Patrick J. Cafferty, Jr., Dept. of Justice, Edward C. Gray, U.S. Environmental Protection Agency, Washington, D.C., for defendant.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This dispute between plaintiff Chevron Chemical Company ("Chevron") and defendant Douglas M. Costle, Administrator of the United States Environmental Protection Agency ("EPA"), arises out of EPA's intended use of Chevron's test data to support pesticide registration applications of certain of Chevron's competitors. Presently before the Court are Chevron's application for a preliminary injunction and EPA's motion for summary judgment. The factual and statutory background of this controversy follows.

## I. BACKGROUND

Federal regulation of the manufacture and sale of pesticides began in 1947 with the enactment of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 135 *et seq.* Administration of FIFRA was transferred in December, 1970 from the U.S. Department of Agriculture to EPA. FIFRA mandated the registration of every pesticide marketed in interstate, though not intrastate, commerce. In order

to obtain a registration, the applicant was required to demonstrate the safety and efficacy of the pesticide product through the submission, *inter alia*, of research and test data. The obtaining of this data often entailed considerable expense, and much of it consisted of trade secret or otherwise confidential information.

FIFRA was amended in 1972 by Section 2 of the Federal Environmental Pesticide Control Act ("FEPCA"), Pub.L. 92–516, 92d Cong., 2d Sess. (Oct. 21, 1972) 86 Stat. 973. As relevant to this action, Section 3 of the 1972 Act, 7 U.S.C. § 136a, provided that data submitted in support of an application should not, without the permission of the applicant, be considered by the EPA Administrator in support of any other application for registration unless the subsequent applicant had first offered to pay reasonable compensation to the original applicant for producing the test data to be relied upon and the data did not contain or relate to trade secrets.[1] Significantly, the 1972

Act did not expressly indicate whether the restrictions on the Administrator's use of the data and the required compensation provisions applied to all test data ever submitted in support of a registration application, or merely to data submitted after the effective date of the 1972 Act, and litigation on that issue ensued.

FIFRA was amended in 1975 in an effort to clarify this issue. As amended, Section 3(c)(1)(D)[2] of FIFRA restricted the use by the Administrator of non-trade secret test data originally submitted *on or after January 1, 1970.* Such data could not be used without the permission of the original data submitter to support a subsequent application made on or after October 21, 1972 unless the subsequent applicant offered to pay reasonable compensation to the original data submitter. EPA considered itself free to use, and did use, data submitted prior to 1970 without the submitter's consent and without an offer of compensation having been made. In light of this construction of

1. Section 3(c)(1)(D) of FIFRA of 1972 required the submission of a statement which included:

    (D) if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by section [10(b)]. *If the parties cannot agree on the amount* and method of payment, the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances. The Administrator's determination shall be made on the record after notice and opportunity for hearing. If the owner of the test data does not agree with said determination, he may, within thirty days, take an appeal to the federal district court for the district in which he resides with respect to either the amount of the payment or the terms of payment, or both. In no event shall the amount of payment determined by the court be less than that determined by the Administrator; . ..

2. Section 3(c)(1)(D) of FIFRA of 1975 required the submission of a statement which included:

    (D) if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted on or after January 1, 1970, in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by section [10(b)]. This provision with regard to compensation for producing the test data to be relied upon shall apply with respect to all applications for registration or reregistration submitted on or after October 21, 1972. If the parties cannot agree on the amount and method of payment, the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances. The Administrator's determination shall be made on the record after notice and opportunity for hearing. If either party does not agree with said determination, he may, within thirty days, take an appeal to the Federal district court for the district in which he resides with respect to either the amount of the payment or the terms of payment, or both. Registration shall not be delayed pending the determination of reasonable compensation between the applicants, by the Administrator or by the court.

the statute, the constitutionality of the 1975 Act was challenged before a three-judge District Court under then 28 U.S.C. § 2282. *Mobay Chemical Corp. v. Costle,* 12 E.R.C. 1572 (W.D.Mo.1978). The three-judge court adopted EPA's construction of the statute, 12 E.R.C. at 1574, and upheld the constitutionality of the statute. On appeal, the Supreme Court rejected the lower court's interpretation of the statute and dismissed the appeal for want of jurisdiction.

> [W]hatever may be true with respect to data submitted after January 1, 1970, the FIFRA, as amended, does not at all address the issues of the conditions under which pre-1970 data may be used in considering another application. It neither authorizes, forbids, nor requires the existing agency practice with respect to pre-1970 data. As a legal matter, then, appellant's attack is on agency practice, not on the statute. The three-judge court

was thus improperly convened . . . and this Court does not have jurisdiction to entertain a direct appeal from the judgment in such case.

*Mobay Chemical Corp. v. Costle,* 439 U.S. 320, 320–21, 99 S.Ct. 644, 58 L.Ed.2d 549 (1979) (citations omitted).

The Supreme Court's opinion in *Mobay,* construing the 1975 amendments to FIFRA, was issued on January 8, 1979. Several months earlier, in September, 1978, Congress once again had amended FIFRA by enacting the provisions governing the instant litigation, Pub.L. 95–396, 95th Cong., 2d Sess. (Sept. 30, 1978), 92 Stat. 820. The 1978 amendments eliminated the prohibition against consideration by EPA of any test data classified as trade secrets. By its terms the 1978 Act also established at least two, and perhaps three, categories of test data available for consideration by EPA under varying conditions.[3] With respect to

---

3. Section 3(c)(1)(D) of FIFRA of 1978 requires the submission of a statement which includes:

> (D) except as otherwise provided in subsection (c)(2)(D) of this section, if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, or alternatively a citation to data that appear in the public literature or that previously had been submitted to the Administrator and that the Administrator may consider in accordance with the following provisions:

> (i) With respect to pesticides containing active ingredients that are initially registered under this Act after the date of enactment of the Federal Pesticide Act of 1978, data submitted to support the application for the original registration of the pesticide, or an application for an amendment adding any new use to the registration and that pertains solely to such new use, shall not, without the written permission of the original data submitter, be considered by the Administrator to support an application by another person during a period of ten years following the date the Administrator first registers the pesticide: *Provided,* That such permission shall not be required in the case of defensive data;

> (ii) except as otherwise provided in subparagraph (D)(i) of this paragraph, with respect to data submitted after December 31, 1969, by an applicant or registrant to support an application for registration, experimental use permit, or amendment adding a new use to an existing registration, to support or maintain in effect an existing registration, or for registration, the Administrator may, without the permission of the original data submitter, consider any such item of data in support of an application by any other person (hereinafter in this subparagraph referred to as the 'applicant') within the fifteen-year period following the date the data were originally submitted only if the applicant has made an offer to compensate the original data submitter and submitted such offer to the Administrator accompanied by evidence of delivery to the original data submitter of the offer. The terms and amount of compensation may be fixed by agreement between the original data submitter and the applicant, or, failing such agreement, binding arbitration under this subparagraph. If, at the end of ninety days after the date of delivery to the original data submitter of the offer to compensate, the original data submitter and the applicant have neither agreed on the amount and terms of compensation nor on a procedure for reaching an agreement on the amount and terms of compensation, either person may initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of the Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings, and the findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to

data submitted to support a registration application initially granted after September 30, 1978 ("post-1978 data"), the Administrator may not consider such data to support an application by another person, without the permission of the original data submitter, for a period of ten years following the initial registration. Thus, data submitters are entitled to a ten-year period of exclusive use for post-1978 data. 7 U.S.C. § 136a(c)(1)(D)(i). With respect to data submitted after December 31, 1969 ("post-1969 data"), the Administrator may consider such data to support an application by another person, without the permission of the original data submitter, for a period of fifteen years following submission of the data only if the subsequent applicant has offered to compensate the original data submitter. Disputes as to compensation are submitted to binding arbitration, unreviewable by any court absent fraud or misrepresentation. An original data submitter who refuses to participate in an arbitration proceeding forfeits the right to compensation. Thus, data submitters are entitled to a fifteen-year period of compensation for use of post-1969 data. 7 U.S.C. § 136a(c)(1)(D)(ii). Data submitted after 1978, for which ten years of exclusive use is assured, also receives five years of compensation upon expiration of the exclusive use period. The section of the statute potentially creating a third category of data reads:

> (iii) after expiration of any period of exclusive use and any period for which compensation is required for the use of an item of data under subparagraphs (D)(i) and (D)(ii) of this paragraph, the Administrator may consider such item of data in support of an application by any other applicant without the permission of the original data submitter and without an offer having been received to compensate the original data submitter for the use of such item of data;

7 U.S.C. § 136a(c)(1)(D)(iii). EPA contends that Congress enacted a comprehensive scheme whereby the newest data is afforded the greatest protection—exclusive use—and the oldest data is afforded the least protection—unrestricted use by the Administrator of all data submitted before January 1, 1970 ("pre-1970 data"). Chevron argues that the quoted language merely authorizes unrestricted use of data in the first two categories once the applicable time period has expired, and does not authorize consideration of pre-1970 data.

the arbitration or the arbitrator where there is a verified complaint with supporting affidavits attesting to specific instances of such fraud, misrepresentation, or other misconduct. The parties to the arbitration shall share equally in the payment of the fee and expense of the arbitrator. If the Administrator determines that an original data submitter has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the original data submitter shall forfeit the right to compensation for the use of the data in support of the application. Notwithstanding any other provision of this Act, if the Administrator determines that an applicant has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the Administrator shall deny the application or cancel the registration of the pesticide in support

of which the data were used without further hearing. Before the Administrator takes action under either of the preceding two sentences, the Administrator shall furnish to the affected person, by certified mail, notice of intent to take action and allow fifteen days from the date of delivery of the notice for the affected person to respond. If a registration is denied or canceled under this subparagraph, the Administrator may make such order as the Administrator deems appropriate concerning the continued sale and use of existing stocks of such pesticide. Registration action by the Administrator shall not be delayed pending the fixing of compensation;

(iii) after expiration of any period of exclusive use and any period for which compensation is required for the use of an item of data under subparagraphs (D)(i) and (D)(ii) of this paragraph, the Administrator may consider such item of data in support of an application by any other applicant without the permission of the original data submitter and without an offer having been received to compensate the original data submitter for the use of such item of data; . . . ..

Within this complicated statutory framework, the facts giving rise to this dispute are relatively simple. Beginning in 1955, Chevron supplied EPA or its predecessor agencies with test data to support its registration applications for the pesticide "naled," marketed by Chevron under the trademark of DIBROM. This test data was otherwise kept confidential by Chevron, and EPA concedes that it includes trade secrets. Beginning in 1966, Chevron also supplied EPA or its predecessor agencies with test data to support its registration applications for a chemical compound known as "paraquat." This test data similarly was kept confidential and includes trade secrets. Chevron contends, and the Court accepts for purposes of these motions, that compilation of the naled and paraquat data cost several million dollars, and that duplication of the data by a competitor "would require scientific and technical know-how believed to be possessed only by Chevron."

The patents on naled and paraquat expired in February, 1978. A number of Chevron's competitors are seeking to market naled and paraquat products and accordingly have submitted registration applications to EPA. These firms have offered to compensate Chevron for the use by EPA of Chevron's post-1969 data, but have offered no compensation for pre-1970 data. EPA intends to rely on Chevron's pre-1970 and post-1969 data in support of these applications, and if such reliance is permitted, will issue registrations to one or more of Chevron's competitors.

The extent of the Administrator's "use" of Chevron's data requires some explanation. EPA does not physically deliver the data to Chevron's competitors, does not make the data available for inspection by them, and does not disclose the contents of the data to them under the statutory provisions challenged here. Rather, EPA reexamines the data previously supplied to it by Chevron to assure itself of the safety and efficacy of the competitor's similar or identical products.

In support of its motion for a preliminary injunction, Chevron contends that the Administrator's use of Chevron's data for the benefit of Chevron's competitors constitutes a "taking" of Chevron's property under the fifth amendment. This taking may be enjoined, it is argued, because FIFRA, as amended, does not authorize the Administrator's use of pre-1970 data, the taking is for a private rather than a public purpose, and the statutory compensation provisions calling for binding arbitration unconstitutionally preclude a judicial determination of "just compensation." In addition, the statute is said to violate Chevron's right to due process in that it acts retroactively to divest Chevron of its trade secret property.

In response to Chevron's arguments and in support of its own motion for summary judgment, EPA contends that any taking involved here may not be enjoined because such taking is authorized by the statute, is for a public purpose, and a monetary remedy is available to Chevron in the Court of Claims under the Tucker Act, 28 U.S.C. § 1491. Alternatively, EPA argues that the Administrator's mere reliance on Chevron's data does not constitute a taking under the fifth amendment. Finally, EPA asserts the statute's application is not retroactive and does not otherwise offend due process considerations.

Chevron is not before the Court seeking damages or other monetary compensation from the United States or EPA as a result of a taking of its property. If EPA's use of Chevron's data is permitted to proceed, a result which necessarily recognizes the availability of a Tucker Act remedy, Chevron's claim for such relief must be brought in the Court of Claims. A ruling by this Court on the issue of whether EPA's use of the data does constitute a taking under the fifth amendment would bar relitigation of that question there. *See Advertising Checking Bureau, Inc. v. United States*, 159 F.Supp. 330, 332–33, 141 Ct.Cl. 430 (1958). *Accord, Carney v. United States*, 462 F.2d 1142, 1145, 199 Ct.Cl. 160 (1972); *Clement v. United States*, 140 F.Supp. 573, 574 (Ct.Cl. 1956). In light of the disposition of the issues which follows, it is unnecessary for this Court to reach the taking question.

Accordingly, the Court follows the example of the Supreme Court in *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 94 n.39, 98 S.Ct. 2620, 2641, n.39, 57 L.Ed.2d 595 (1978), and offers no view on that issue. *See also Pennsylvania v. Interstate Commerce Commission,* 535 F.2d 91, 97 (D.C.Cir.), *cert. denied,* 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976).

## II.  AUTHORIZATION FOR USE OF PRE–1970 DATA

█ The threshold issue facing the Court is whether the statute does or does not authorize consideration of pre-1970 data. In construing § 3(c)(1)(D) of FIFRA, the starting point, of course, is the literal language of the statute, although the inquiry need not end there.

Subparagraphs (i) and (ii) of § 3(c)(1)(D) respectively provide for a period of exclusive use for very recent (post-1978) data and a period of compensation for less recent (post-1969) data. Subparagraph (iii) then authorizes unrestricted use of data by the Administrator "after expiration of any period of exclusive use and any period for which compensation is required for the use of an item of data under subparagraphs (D)(i) and (D)(ii) of this paragraph. . ." Chevron urges that subparagraph (iii) merely specifies the treatment to be accorded data from subparagraphs (i) and (ii) once the period of statutory protection has run out and, like the 1975 amendments to FIFRA construed in *Mobay, supra,* is silent as to pre-1970 data. EPA argues that since pre-1970 data is not subject to a period of exclusive use under subparagraph (i) and is not subject to the compensation period specified in subparagraph (ii), those periods must be considered to have "expired" under subparagraph (iii) as to pre-1970 data.

Plainly, the literal language of the statute does not expressly reference pre-1970 data, either by authorizing or prohibiting use of it by the Administrator. Read in isolation, subparagraph (iii) favors the interpretation ascribed to it by Chevron. However, that interpretation appears to be "at variance with the policy of the legislation as a whole," justifying and perhaps requiring reliance upon aids to construction over the literal words of the legislation. *See United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940).

EPA has offered a number of items having questionable value as legislative history, such as testimony and correspondence by industry witnesses and *post hoc* Congressional committee statements,[4] in an effort to demonstrate Congress' expressed intent to authorize unrestricted use of pre-1970 data. In fact, the competent legislative history of the 1978 amendments offers no clear-cut, unambiguous statement in a committee report, conference report, or by an individual legislator specifically addressing the permissible uses of pre-1970 data.

A rather straightforward argument, appealing in its simplicity, can be made to support the view that pre-1970 data is not governed by the provisions of the 1978 amendments: The Supreme Court's ruling in *Mobay* established that the 1975 Act neither authorized, forbade nor required consideration of pre-1970 data. The 1978 amendments contain no express reference to that issue. Therefore, the status quo was maintained with respect to pre-1970 data. Nevertheless, a more detailed examination of the legislative scheme militates against adoption of this view, although the issue is hardly free from doubt.

Had *Mobay* issued prior to the enactment of these amendments, the absence of any

---

4. A January, 1979 "Committee Print," prepared "for the use of the [Senate] Committee on Agriculture, Nutrition, and Forestry," contains a section-by-section analysis of the 1978 amendments to FIFRA. The discussion of § 3(c)(1)(D) states at page 138:

Data submitted prior to December 31, 1969, may be considered in support of subsequent applications to which they pertain without applicants incurring any obligation to pay compensation or to seek the permission of the original data submitter.

This passage, while directly on point, appears in a document issued four months after enactment of the legislation.

express reference to pre-1970 data might well have proved fatal to EPA's position. Inasmuch as the 1978 amendments preceded the January 8, 1979 Opinion, however, the failure by Congress to discuss and expressly resolve the issue created by that ruling becomes more understandable. Legislative intent must therefore be gleaned from an examination of the fault to be corrected and the method employed to accomplish the Congressional goal. *See Warner v. Goltra*, 293 U.S. 155, 158, 55 S.Ct. 46, 47, 79 L.Ed. 254 (1934).

The report of the Senate Committee on Agriculture, Nutrition, and Forestry accompanying S.1678, the Senate forerunner of the 1978 amendments, describes a registration process that had "ground to a virtual halt." S.Rep. No. 95–334, 95th Cong., 1st Sess. (1977) at 3.

> Beyond the problems cited above, the most serious problem in the current program is the logjam of litigation that resulted from controversies over data compensation and trade secret protection.
>
> The lack of clarity of sections 3(c)(1)(D) and 10(b) of FIFRA has not only snagged the registration process; it is impacting on the structure of the industry. The Environmental Protection Agency has suggested that these two provisions are resulting in a contraction in the industry, and the Department of Justice has indicated that the provisions in present law are "needlessly anti-competitive."
>
> Those concerns are detailed in the EPA study entitled "FIFRA: Impact on the Industry" and in the Department of Justice views which are included in this report.

*Id.* The EPA study, cited with seeming approval in the Committee's report, described the existing statutory provisions as follows:

> In 1975, § 3(c)(1)(D) was amended to provide that the limitations it placed on the Administrator's consideration of data did not apply to data received by EPA (or its predecessors) before 1970.

*Id.* at 39. Of course, EPA's interpretation of the 1975 Act subsequently was invalidated in *Mobay*. Nonetheless, at the time the 1978 amendments were under consideration, Congress may well have accepted EPA's conclusion as accurate and determined that there was no need to address further the issue of pre-1970 data.

This view finds support elsewhere in the legislative history. Repeated references are made to the artificial extension of patent rights on chemicals that grew out of the 1972 and 1975 versions of FIFRA. Patents vest the patentee with certain monopolistic rights for a period of 17 years in exchange for public disclosure of the methods, processes and ingredients used to produce the product. Ordinarily, competitors are free to use this information upon expiration of the 17-year period to produce and market the same product. In the case of patented pesticides, registration through *proof of safety and efficacy* is a prerequisite to marketability. Upon expiration of a pesticide patent, a competitor who is unable to duplicate the test data submitted by the patentee and original registrant cannot obtain a registration from EPA to market the pesticides, and the monopoly power associated with patent rights arguably is extended beyond the statutory 17-year period.

The 1975 amendments to FIFRA, as construed in *Mobay*, did not authorize consideration of any test data without the permission of or payment of compensation to the original data submitter. The periods of exclusive use for trade secrets and of mandatory compensation for other data submitted on or after January 1, 1970 extended in perpetuity. The 1978 amendments effected a *significant change* in this regard. Section 3(c)(1)(D)(iii) establishes that as to data for which the periods of statutory protections have expired, including trade secret data, the Administrator's authority to consider the date is unfettered. Since *no such* unfettered authority was permitted by the earlier statutes, the inquiry must focus on the breadth of this grant of authority.

The report of the Senate Agriculture Committee on S.1678,[5] which called for a seven year period of mandatory compensation followed by unrestricted consideration by the Administrator, spoke of the Committee's desire to end extension of patent rights beyond the statutory period.

> The amendments also avoid an extension of the patent rights on chemicals. More importantly, these amendments eliminate FIFRA's most severe regulatory impact on the industry—the anti-competitive effects of *de facto* "exclusive use."

S.Rep. No. 95–334, 95th Cong., 1st Sess. (1977), at 31.

The House-Senate conference did not adopt S.1678, but chose instead to provide a ten-year period of exclusive use for "new" data; *i. e.*, data submitted to support registrations granted after the effective date of the 1978 Act. That the protection of exclusive use applies only to this new data was made abundantly clear in the explanation of the conference bill offered by Senator Leahy, the floor leader and Chairman of the Subcommittee that had drafted S.1678:

> *By limiting exclusive use to data pertaining to pesticide ingredients not previously registered*, and only for a 10-year period, the conferees have largely confined exclusive use coverage to chemicals that are patentable and for a term generally shorter than the patent life enjoyed by pesticides. *The anticompetitive aspects of exclusive use have therefore been essentially neutralized.*

124 Cong.Rec. S 25303 (Sept. 18, 1978 daily ed.) (emphasis added). The interpretation

urged here by Chevron, that the 1978 amendments do not authorize consideration of pre-1970 data, would result in a perpetual period of "*de facto* exclusive use" for pre-1970 data, contrary to the views expressed by Senator Leahy.

Given the likelihood that Congress did not perceive a need to address explicitly the permissible uses of pre-1970 data, Senator Leahy's remarks appear to be the most persuasive evidence of legislative intent. In light of the perceived policy of the legislation as a whole, the prevention of an artificial extension of pesticide patent rights, the elimination of "anti-competitive" effects of the earlier legislation, and the authorization of unfettered reliance by EPA on certain classes of data, coupled with the likely reliance by Congress on the EPA's construction of the 1975 Act, I conclude that the 1978 amendments to FIFRA authorize consideration by the Administrator of pre-1970 data without the permission of the original data submitter and without an offer of compensation having been made.[6]

### III. PUBLIC OR PRIVATE PURPOSE OF ANY TAKING

The next issue presented is Chevron's contention that the Administrator's use of both its pre-1970 and post-1969 data may be enjoined as an unconstitutional taking of Chevron's property for a private rather than a public use. Use of Chevron's data is said to benefit only those competitors of Chevron who have not invested similar time, money and energy to develop their own test data, but now seek a "free ride"

---

5. While the Senate bill's deletion of the January 1, 1970 cutoff date ultimately was rejected in conference, S.1678 is significant here because it, like the conference bill actually adopted, provided that certain data was available for unrestricted consideration upon expiration of a period of statutory protection.

6. The Court recognizes that either interpretation of the statutorily permissible uses of pre-1970 data produces a somewhat anomalous result. For example, if the statute authorizes the use of pre-1970 data without compensation, then data submitted in December, 1969 generates no compensation, while data submitted only one month later will continue to generate

compensation until January, 1985. Of course, many statutes establishing arbitrary deadlines, such as the Internal Revenue Code, produce similar results.

A contrary interpretation of FIFRA, however, leads to an even greater anomaly. If the use of pre-1970 data is not authorized, then the newest data (post-1978) would receive exclusive use protection that expires after ten years, older data (post-1969) would receive compensation protection that expires after 15 years, while the oldest data (pre-1970) would receive the greatest protection of all, exclusive use for an unlimited period. In my view, such a result was not intended by Congress.

toward marketability for their pesticide products.

EPA, while contending that no taking is effected through mere consideration of Chevron's data, argues that even if a fifth amendment taking were to be found, the legislative history of FIFRA provides ample evidence of the public purposes of fostering competition in the pesticide industry and preventing extension of monopoly protection beyond the 17-year patent period. EPA therefore contends that Chevron is entitled at most to compensation for the taking of its test data, rather than to the injunctive relief it seeks.

Chevron relies heavily on *Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510 (1937), which invalidated a gas proration order issued by the Railroad Commission of Texas because of its exclusively private purpose and effect. The statute authorizing the Commission's order was intended to eliminate waste of natural gas and prohibited "production of natural gas in excess of transportation or market facilities. . . ." 300 U.S. at 63, 57 S.Ct. at 368. The actual order at issue reduced plaintiffs' allowable production to a volume far below their requirements to meet contractual obligations in various markets. The Court cited the lower court's finding that the purpose of the order was to force plaintiffs and others similarly situated:

> to buy gas from, and thus share their private marketing contracts and commitments and the use of their pipe lines and other facilities for transmitting their gas to market with, the owners of wells not now connected to pipe lines, who have not contributed in money, services, negotiations, skill, forethought or otherwise to the development of such markets and the construction of such pipe lines and other facilities.
>
> \* \* \* \* \* \*
>
> The use of the pipe line owner's wells and reserves is curtailed solely for the benefit of other private well owners. . . There is here no taking for the public

benefit, nor is payment of compensation provided.

300 U.S. at 77–78, 57 S.Ct. at 375.

*Thompson* is not controlling in the instant case for a number of reasons. First, the Court's holding there hinged on the complete absence of a public purpose for the taking. Had the proration order served a public purpose, "the fact that thereby other private persons would incidentally and gratuitously obtain important benefits would present no constitutional obstacle." 300 U.S. at 77, 57 S.Ct. at 374. Further, "when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. . . . The role of the judiciary in determining whether [the eminent domain] power is being exercised for a public purpose is an extremely narrow one." *Berman v. Parker*, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). This judicial deference to legislative determinations is particularly required when reviewing Federal as opposed to State legislation. *United States ex rel. Tennessee Valley Authority v. Welch*, 327 U.S. 546, 552, 66 S.Ct. 715, 717, 90 L.Ed. 843 (1946).

As stated in Part II, *supra*, Congress had determined that the provisions of the 1972 and 1975 amendments to FIFRA were needlessly anti-competitive and were resulting to some extent in artificial extension of pesticide patent rights. The unavailability of previously submitted test data to support subsequent registration applications hampered the registration process and required subsequent applicants to produce and submit essentially the same information. Commenting on the counterproductivity of this process, EPA reported to Congress, "Multiple citations or submissions of the same data do nothing to enhance the determination of safety." Easier access to data would result in "an administrative cost saving to the Agency and to registrants." S.Rep. No. 95–334, 95th Cong., 1st Sess. (1977) at 63. *See also Id.* at 27, 30, 33. Any such cost saving, of course, inures eventually to the benefit of taxpayers and consumers.

Chevron contends that any Congressional intent to foster competition is not served in the instant case because there has been no legislative or judicial finding that Chevron enjoys monopoly power or has engaged in anti-competitive conduct. A similar argument was rejected in *Berman v. Parker, supra,* 348 U.S. at 34–35, 75 S.Ct. at 103, where the Court declined to focus on the applicability of a broadly defined Congressional concern to a particular litigant. Congress may properly determine, as it did here, that the anti-competitive nature of the registration process affected the entire pesticide industry. Its chosen method of alleviating this problem serves a public interest of sufficient magnitude to withstand a constitutional challenge.

## IV. AVAILABILITY OF A TUCKER ACT REMEDY

Having concluded that the Administrator's consideration of Chevron's data is authorized, and that use of the data serves a public purpose, it remains to be determined whether just compensation is available through a Tucker Act[7] remedy in the Court of Claims. Chevron asserts that a Tucker Act remedy is unavailable for the use of pre-1970 data because such use is unauthorized and principles of sovereign immunity preclude recovery for an unauthorized taking. As to post-1969 data, for which compensation is statutorily provided, Chevron argues that the compensation scheme of negotiation and binding arbitration was intended by Congress to be the exclusive remedy available to data submitters, thereby evincing a legislative intent to withdraw the Tucker Act remedy.

EPA responds that there is no evidence indicating a Congressional intent to withdraw the Tucker Act grant of jurisdiction to the Court of Claims to hear a claim against the United States arising under the Constitution. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 126, 95 S.Ct.

335, 349, 42 L.Ed.2d 320 (1974). The FIFRA statute itself most certainly is silent on the point, and the legislative history is said to demonstrate no Congressional consideration of the issue. Therefore, EPA argues, since a Tucker Act remedy remains available for any taking, EPA's action may not be enjoined. *Regional Rail Cases, supra. See also Duke Power Co. v. Carolina Environmental Study Group, Inc., supra,* 438 U.S. at 94 n. 39, 98 S.Ct. at 2641; *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 697 n. 18, 69 S.Ct. 1457, 1465 n. 18, 93 L.Ed. 1628 (1949).

In passing on this same question, the court in *Amchem Products, Inc. v. Costle,* 481 F.Supp. 195 (S.D.N.Y.1979), stated:

I do not deem it at all clear, given the specific provisions for payment and non-payment provided for in the 1978 FIFRA amendment 7 U.S.C. § 136a(c)(1)(D) that relief under the Tucker Act is the simple answer that the government claims. Not only does FIFRA expressly provide as to certain data there shall be no compensation at all, 7 U.S.C. § 136a(c)(1)(D)(iii), thus raising the question of the withdrawal of Tucker Act jurisdiction, see *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 126 [95 S.Ct. 335, 349, 42 L.Ed.2d 320] (1974), but also, and more to the point, plaintiffs here do not seek damages but rather a declaratory judgment of unconstitutionality prior to sustaining potentially uncompensable damages. This they may properly do. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 71 n. 15 [98 S.Ct. 2620, 2629 n. 15, 57 L.Ed.2d 595] (1978).

*Id.* at 199. To the extent that the court in *Amchem Products* recognized a possible withdrawal in FIFRA of Tucker Act jurisdiction, I respectfully disagree.

■ *Regional Rail Cases, supra,* makes clear that Tucker Act jurisdiction is not to be deemed withdrawn by implication. 419

---

7. The Tucker Act, 28 U.S.C. § 1491, reads in pertinent part:

    The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Con-

stitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

U.S. at 133–34, 95 S.Ct. at 353. The data compensation language in the FIFRA statute, and the debate preceding it, relate to compensation to be paid by a *private* entity, the subsequent applicant, to the original data submitter. They do not address, much less limit, the liability of the *government* to pay just compensation if a taking occurs. This failure to consider recourse against the government may reflect nothing more than a Congressional belief, correct or otherwise, that the authorized use of the data by EPA effects no fifth amendment taking and hence does not give rise to governmental liability.

Chevron's argument that use of pre-1970 data is not authorized has been rejected in Part II, *supra*. As to post-1969 data, the binding arbitration provisions govern data compensation disputes between private entities. The statute prohibits judicial review of an arbitrator's decision as to how much compensation must be paid by a subsequent applicant to an original data submitter, thereby expediting final disposition of those disputes. Such an arbitration scheme between private parties cannot and does not preclude resort to the Court of Claims if the arbitrator's award is constitutionally deficient. *Cf. Pennsylvania v. Interstate Commerce Commission*, 535 F.2d 91, 97–98 & n. 13 (D.C.Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976).

*Duke Power Co. v. Carolina Environmental Study Group, Inc., supra*, does not require a contrary result. That case held that 28 U.S.C. § 1331(a) provided jurisdiction to hear a claim that an Act of Congress did not provide advance assurance of adequate compensation in the event of a taking, and upon a finding to that effect, the Declaratory Judgment Act, 28 U.S.C. § 2201, provided a remedy. 438 U.S. at 71 n. 15, 98 S.Ct. at 2629. Once a determination of Tucker Act availability was made, however, a declaratory judgment or other injunctive relief on the taking issue was unwarranted. 438 U.S. at 94 n. 39, 98 S.Ct. at 2641.

■ Accordingly, I conclude that the Administrator's use of Chevron's data is authorized, serves a public purpose, and that a remedy is available to Chevron under the Tucker Act for any taking that is effected. EPA's consideration of Chevron's data therefore may not be enjoined as an unconstitutional taking without just compensation.[8]

## V. RETROACTIVE APPLICATION OF THE STATUTE

Chevron alleges finally that elimination of the prohibition against the use of trade secrets effected by the 1978 FIFRA amendments retroactively divests Chevron of its property right of exclusive use without due process of law. In support of this claim, Chevron asserts that it submitted its trade secret test data to EPA and its predecessor agencies with the expectation that trade secrets would not be made available to support registration applications by competitors. This expectation grew out of state common law protection for trade secrets, federal agency practice and procedure, and the explicit prohibition against the Administrator's use of trade secrets embodied in the 1972 and 1975 versions of FIFRA. The 1978 Act, which authorizes consideration of trade secret data, is said to apply retrospectively to defeat this settled expectation.

EPA disputes the contention that the statute applies retroactively, arguing that use of trade secret data is authorized only to support registrations issued after the effective date of the 1978 FIFRA amendment. EPA seeks to distinguish on this basis the holding in *Ettor v. Tacoma*, 228 U.S. 148, 33 S.Ct. 428, 57 L.Ed. 773 (1913), which invalidated a legislative attempt to immunize a municipality from liability for damage caused to a private citizen's property by street grading operations. The statute authorizing a claim for damages against the city was repealed after the plaintiff's property had been damaged, and therefore after his right to compensation had vested. 228 U.S. at 155–58, 33 S.Ct. at 430–31.

---

**8.** As noted at pages 737–738, *supra*, no view is expressed as to whether EPA's use of the data actually constitutes a fifth amendment taking entitling Chevron to just compensation.

EPA asserts in the instant case that the 1978 FIFRA amendments do not undermine Chevron's claims *under the earlier statutes* to prevent the issuance of registrations where Chevron's trade secret data was used prior to 1978, but govern only the permissible use of that data after the effective date of the 1978 Act.

It must be concluded, however, that the 1978 FIFRA amendments do have a retroactive effect. Just as the plaintiff's expectation of compensation in *Ettor* arose prior to the statute in question, so too did Chevron's expectation of exclusive use for trade secrets arise before enactment of the 1978 Act. The question before the Court is whether Chevron's expectations may be defeated in the manner prescribed by Congress.

■ If, as Chevron contended earlier, the Administrator's use of Chevron's data constitutes a "taking" of Chevron's property, its due process claim must necessarily fail, for the mere exercise of eminent domain power does not offend due process. *Roberts v. New York City*, 295 U.S. 264, 55 S.Ct. 689, 79 L.Ed. 1429 (1935); *Elterich v. City of Sea Isle City*, 477 F.2d 289, 290 (3d Cir. 1973). In such case, Chevron's available remedy in the Court of Claims fully satisfies constitutional requirements.

■ Alternatively, if use of the data is not a taking, the inquiry under due process analysis is whether the law is rationally related to a legitimate state interest.

> [T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.

*Williamson v. Lee Optical Co.*, 348 U.S. 483, 487–88, 73 S.Ct. 461, 464, 99 L.Ed. 563 (1955). The burden of demonstrating the statute's irrationality is on Chevron.

It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). Retroactive measures are subjected to a closer degree of scrutiny than are purely prospective measures. *Id.* at 16–17, 96 S.Ct. at 2892–2893; *Daughters of Miriam Center for the Aged v. Mathews*, 590 F.2d 1250, 1259 (3d Cir. 1978). Nevertheless, even retroactive legislation retains at the outset its presumption of constitutionality. *Cf. Daughters of Miriam, supra*, 590 F.2d at 1257. Further, the Constitution does not prohibit "the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object," even though otherwise settled expectations may be upset thereby. *Duke Power Co. v. Carolina Environmental Study Group, Inc., supra*, 438 U.S. at 88 n. 32, 98 S.Ct. at 2638, *quoting Silver v. Silver*, 280 U.S. 117, 122, 50 S.Ct. 57, 74 L.Ed. 221 (1929); *Usery v. Turner Elkhorn Mining Co., supra*, 428 U.S. at 16, 96 S.Ct. at 2892. This principle is particularly evident in the context of zoning or other land use restrictions which survive constitutional challenge despite their effect of undermining property owners' settled expectations. *See, e. g., Rogin v. Bensalem Township*, 616 F.2d 680, 689–690 (3d Cir. 1980); *Haas v. City and County of San Francisco*, 605 F.2d 1117, 1119–21 (9th Cir. 1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980).

■ In the instant case, Congress determined that the pesticide registration program was operating ineffectively under the 1975 amendments to FIFRA. Restrictions on the use of data were thought to contribute to artificial extension of pesticide patent rights and to stifle competition in the industry. *See* Part II, *supra*. Since the enhancement of competition in interstate commerce is certainly a permissible legislative objective, it remains only to determine whether the legislative scheme chosen is a sufficiently reasonable means of attaining the Congressional goal. Where the legisla-

tion in question is retroactive, this determination entails a balancing of the public interest in the retroactive rule with the private interests that are upset by it. *Daughters of Miriam, supra,* 590 F.2d at 1260 & n. 27.

As noted earlier, the statutory provisions challenged here permit the use rather than the disclosure of a registrant's trade secret data to support a subsequent application. If Chevron's trade secret data contains information beyond that which was necessary to obtain its own registrations, such information will not fall into the hands of Chevron's competitors by operation of § 3(c)(1)(D). If, on the other hand, Chevron's data contains only the minimal amount of information necessary to secure its registrations, no less "revealing" data could have been submitted by Chevron if it hoped to market its product. In either case, therefore, Chevron has suffered no prejudice by operation of § 3(c)(1)(D) because of its reliance on the earlier statutory provisions.

The 1978 FIFRA amendments to § 3(c)(1)(D) simply permit EPA to review data already in its files to assure itself that a pesticide product previously shown to be safe and efficacious remains so when marketed under another brand name. When one considers the alternative means available to foster competition by easing registration barriers, such as release of all data by EPA to subsequent applicants for resubmission by them, or, at the opposite extreme, elimination altogether of the need for safety and efficacy data submissions, it appears that Congress has chosen a reasonable cure for the perceived problem. The challenged legislation does not offend due process considerations.

Having considered those few facts that are disputed in the light most favorable to Chevron, I conclude that defendant Costle is entitled to judgment as a matter of law. Accordingly, plaintiff's application for a preliminary injunction will be denied, and defendant's motion for summary judgment will be granted.